Vincent M. PIAZZA, et al.

v.

MAJOR LEAGUE BASEBALL, et al.

Civ. A. No. 92-7173.

United States District Court,
E.D. Pennsylvania.

Aug. 4, 1993.

Bruce W. Kauffmann, Dilworth, Paxson, Kalish & Kauffmann, Philadelphia, PA, for plaintiffs.

Arthur Makadon, Philadelphia, PA, for defendants.

## OPINION

PADOVA, District Judge.

Plaintiffs allege that the organizations of professional major league baseball and an affiliated individual frustrated their efforts to purchase the San Francisco Giants baseball club (the "Giants") and relocate it to Tampa Bay, Florida. Plaintiffs charge these defendants with infringing upon their rights under the United States Constitution and violating federal antitrust laws and several state laws in the process.

Asserting that this Court lacks subject matter jurisdiction over plaintiffs' federal and state claims and that plaintiffs' federal claims fail to state a cause of action, defendants move to dismiss this suit. With regard to plaintiffs' federal antitrust claims, defendants also claim exemption from antitrust liability under *Federal Baseball Club of Baltimore, Inc. v. National League of Professional Baseball Clubs*, 259 U.S. 200, 42 S.Ct. 465, 66 L.Ed. 898 (1922), and its progeny. For the following reasons, I will grant defendants' motion as to plaintiffs' direct claims under the Constitution; but I will deny defendants' motion in all other respects. As to defendants' assertion of exemption from antitrust liability, I hold that the exemption created by *Federal Baseball* is inapplicable here because it is limited to baseball's "reserve system."

## I. BACKGROUND

### A. The Allegations [1]

Plaintiffs are Vincent M. Piazza and Vincent N. Tirendi, both Pennsylvania residents, and PT Baseball, Inc. ("PTB"), a Pennsylvania corporation wholly owned by Piazza and Tirendi. Pursuant to a written Memorandum of Understanding ("Memorandum") dated August 18, 1992, Piazza and Tirendi agreed with four other individuals, all Florida residents, to organize a limited partnership for the purpose of acquiring the Giants. (The parties to the Memorandum will be referred to collectively as the "Investors".)

The Investors anticipated that they would form individual corporations to serve as general partners of the partnership. Accordingly, on August 26, 1992, PTB entered into a Limited Partnership Agreement (the "Partnership Agreement") with corporations owned by the other Investors. This Partnership Agreement implemented the intent of the Memorandum and created a partnership entity known as Tampa Bay Baseball Club, Ltd. (the "Partnership"). PTB agreed to contribute $27 million to the Partnership, making it the single largest contributor of Partnership capital.

Earlier, on August 6, 1992, the Investors had executed a Letter of Intent with Robert Lurie, the owner of the Giants, to purchase the Giants for $115 million. Pursuant to this Letter of Intent, Lurie agreed not to negotiate with other potential buyers of the Giants and to use his best efforts to secure from defendant Major League Baseball [2] approval of the sale of the Giants to the Partnership and transfer of the team to the Suncoast Dome, located in St. Petersburg, Florida. [3]

As required by the rules of Major League Baseball, the Partnership submitted an application to that organization on September 4, 1992 to purchase the Giants and move the team to St. Petersburg. In connection with this application, Major League Baseball and its "Ownership Committee" undertook or purported to undertake a personal background check on the Investors. On September 10, 1992, defendant Ed Kuhlmann, Chairman of the Ownership Committee, stated at a press conference that, among other things, the personal background check on the Investors had raised a "serious question in terms of some of the people who were part of that group" and that "a couple of investors will not be in the group." Complaint at ¶ 53. Kuhlmann elaborated that there was a "background" question about two of the investors rather than a question of financial capability and that something had shown up on a "security check." Id. Khulmann also stated that the "money" of the two investors "would not have been accepted." Id. Immediately following Kuhlmann at the news conference, Jerry Reinsdorf, a member of the Ownership Committee, added that the Ownership Committee's concern related to the "out-of-state" money and that the "Pennsylvania People" had "dropped out." Complaint at ¶ 56.

As the only principals of the Partnership who reside in Pennsylvania, Piazza and Tir-

---

1. The following relevant facts were taken either directly or inferentially from plaintiffs' complaint.

2. Plaintiffs describe defendant Major League Baseball as an unincorporated association comprised of two professional leagues, the American League and the National League, and their 28 professional baseball teams.

 In addition to Major League Baseball, plaintiffs have named the following as defendants: American League of Professional Baseball Clubs; National League of Professional Baseball Clubs; Office of the Commissioner of Major League Baseball; Ed Kuhlmann; The Orioles, Inc.; The Boston Red Sox Baseball Club; Golden West Baseball Co.; Chicago White Sox, Ltd.; Cleveland Indians Co.; John E. Fetzer, Inc.; Kansas City Royals Baseball Corp.; Milwaukee Brewers Baseball Club; Minnesota Twins; New York Yankees Partnership; The Oakland Athletics Baseball Co.; Seattle Baseball, L.P.; B.R. Rangers Associates, Ltd.; Toronto Blue Jays Baseball Club; Atlanta National Baseball Club, Inc.; Chicago National League Ball Club, Inc.; The Cincinnati Reds; Houston Sports Association, Inc.; Los Angeles Dodgers, Inc.; Montreal Baseball, Ltd.; Sterling Doubleday Enterprises, L.P.; The Phillies; Pittsburgh Associates; St. Louis National Baseball Club, Inc.; San Diego Padres Baseball Partnership; San Francisco Giants; Florida Marlins, Inc.; and Colorado Rockies Baseball. All defendants will be referred to collectively as "Baseball".

3. On August 28, 1992, the Partnership entered into an agreement with the City of St. Petersburg, Florida for management and use of the Florida Suncoast Dome.

endi aver that the clear implication of Kuhlmann's and Reinsdorf's comments, combined with the fact that Piazza and Tirendi are of Italian descent, was that the personal background check had associated them with the Mafia and/or other criminal or organized criminal activity. Piazza and Tirendi further allege that they have never been involved in such activity; nor had they "dropped out" of the Partnership. They also allege that they were never apprised by Baseball or anyone else of the charges against them nor given an opportunity to be heard.

On September 11, 1992, plaintiffs' counsel sent letters to Major League Baseball, Kuhlmann, and Reinsdorf requesting immediate correction of these statements and their implications. Plaintiffs' counsel never received a response to these letters, but on September 12, 1992, defendant Kuhlmann admitted to some members of the media that "there was no problem with the security check." Complaint at ¶ 63.

On the same day that the Partnership submitted its application to purchase and relocate the franchise, Kuhlmann directed Lurie to consider other offers to purchase the Giants, in knowing violation of Lurie's exclusive agreement with the Partnership. On September 9, 1992, Bill White, President of the National League, invited George Shinn, a North Carolina resident, to make an alternative bid to purchase the Giants in order to keep the team in San Francisco. An alternative offer was ultimately made by other investors to keep the Giants in San Francisco. Even though this offer was $15 million less than the $115 million offer made by the Partnership, Major League Baseball formally rejected the proposal to relocate the Giants to the Tampa Bay area on November 10, 1992.

Plaintiffs allege that Baseball never intended to permit the Giants to relocate to Florida and failed to evaluate fairly and in good faith their application to do so. They claim that to avoid relocation of the Giants,

Baseball set out to "destroy the financial capability of the Partnership by vilifying plaintiffs." Complaint at ¶ 65. And in addition to preventing plaintiffs' purchase and relocation of the Giants, plaintiffs allege that Baseball's allegedly defamatory statements cost them the loss of a significant contract in connection with one of their other businesses, which depends upon "impeccable personal reputations." Complaint at ¶ 69.

### B. *The Claims*

#### 1. *Federal claims*

Plaintiffs first claim that the above actions of Baseball violated the First and Fifth Amendments to the United States Constitution by (1) depriving them of their liberty and property interests and privileges without due process of law, (2) denying them equal protection of the laws, and (3) impairing their freedom of contract and association. In this connection, plaintiffs claim that Baseball's actions should be attributed to the federal government, to which the constraints of the U.S. Constitution apply, because the federal government has granted Baseball a unique exemption from the federal antitrust laws.

Plaintiffs next assert a claim under 42 U.S.C.A. § 1983 (West 1981),[4] alleging that Baseball acted under color of state law in unlawfully depriving them of the rights, privileges, immunities, freedoms, and liberties secured by Article IV, Section 2 of the U.S. Constitution, as well as the First, Fifth and Fourteenth Amendments. Plaintiffs claim that Baseball's actions took place under color of state law because (a) Baseball is exempt from liability under state antitrust laws; (b) there is a close nexus and symbiotic relationship between Baseball and state and local governments; and (c) Baseball acted in concert with the City of San Francisco to prevent the Giants from being relocated.

Plaintiffs' final federal claim asserts violations of sections 1 and 2 of the Sherman

---

**4.** Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....
42 U.S.C.A. § 1983.

Anti–Trust Act, 15 U.S.C.A. §§ 1 and 2 (West. 1973 & Supp.1993).[5] Plaintiffs claim that Baseball has monopolized the market for Major League Baseball teams and that Baseball has placed direct and indirect restraints on the purchase, sale, transfer, relocation of, and competition for such teams. Plaintiffs allege that these actions have unlawfully restrained and impeded plaintiffs' opportunities to engage in the business of Major League Baseball.

### 2. *State claims*

Plaintiffs also assert claims against Baseball under Pennsylvania law for slander, libel, invasion of the right of privacy, false light, tortious interference with existing and prospective contractual business relations, unlawful restraint of trade, and civil conspiracy.

## II. *DISCUSSION*

Plaintiffs aver that this Court has jurisdiction over their federal claims pursuant to 28 U.S.C. §§ 1331, 1337, and 1343, and supplemental jurisdiction over their state law claims pursuant to 28 U.S.C. § 1367. Defendants move under Fed.R.Civ.P. 12(b)(1), lack of subject matter jurisdiction, and Fed. R.Civ.P. 12(b)(6), failure to state a claim upon which relief can be granted, for an order dismissing plaintiffs' federal claims and, in the event the federal claims are dismissed, for an order directing dismissal of plaintiffs'. state claims for lack of supplemental jurisdiction.

### A. *Standard of Review*

■ The standards for dismissal of a claim under Fed.R.Civ.P. 12(b)(1) and 12(b)(6) are different. Dismissal is proper under Rule 12(b)(1) "only when the claim 'clearly appears to be immaterial and made solely for the purpose of. obtaining jurisdiction or ... is wholly insubstantial and frivolous.' " *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir.) (quoting *Bell v. Hood*, 327 U.S. 678, 682–83, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946)), *cert. denied,* —— U.S. ——, 111 S.Ct. 2839, 115 L.Ed.2d 1007 (1991). Under Rule 12(b)(6), however, the standard is lower; even if not wholly insubstantial, a claim may be dismissed if no facts have been alleged upon which relief may be granted. *See id.* at 1409–10; *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). The respective burdens upon the parties differ as well. A Rule 12(b)(1) motion places the burden of persuasion on the plaintiff to show that his claims are not wholly insubstantial; under Rule 12(b)(6), the defendant bears the burden of showing that no claim has been stated. *See Kehr Packages,* 926 F.2d at 1409–10.

Challenges for failure to state ·a cause of action "ordinarily should be made under Rule 12(b)(6)." *Id.* at 1409. The Third Circuit has held that a claim dismissed as legally insufficient under Rule 12(b)(1) should properly be treated as having been dismissed pursuant to 12(b)(6) where the plaintiff has approached the defendant's motion as having been made under Rule 12(b)(6). *See id.* Until very recently, both plaintiffs and defendants have treated defendants' motion as having been made solely under Rule 12(b)(6)—defendants informed plaintiffs and the Court that they were proceeding under Rule 12(b)(1) only after the Court raised the point during oral argument and after nearly all of the issues had been fully briefed by both parties. Even at this late stage, however, defendants have not called into question, as required by *Kehr Packages,* the authority of this Court to exercise jurisdiction over plaintiffs' claims under the *federal* Constitution, *federal* civil rights act, and *federal* antitrust laws. Thus, like *Kehr Packages,* plaintiffs' complaint here is more appropriately evaluated for legal sufficiency under Rule 12(b)(6), which requires that this Court view all factual allegations in the complaint and all

---

**5.** Section 1 of the Sherman Act provides, in pertinent part, that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States ... is declared to be illegal...." 15 U.S.C.A. § 1.

In pertinent part, section 2 of the Sherman Act provides that "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any. other person or persons, to monopolize any part of the trade or commerce among the several states ... shall be deemed guilty of a felony...." 15 U.S.C.A. § 2.

reasonable inferences that can be drawn from them as true. *See id.* at 1410. Every doubt is to be resolved in favor of the plaintiff, and the complaint can be dismissed only if the plaintiff has alleged no set of facts upon which relief can be granted. *Id.; Conley v. Gibson,* 355 U.S. at 45–46, 78 S.Ct. at 101–02.

## B. *Direct Constitutional Claims*

 In most instances, the limitations of the First and Fifth Amendments to the U.S. Constitution restrict only federal government action, not the action of private entities. *See Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 936, 102 S.Ct. 2744, 2753, 73 L.Ed.2d 482 (1982); *Nguyen v. United States Catholic Conference,* 719 F.2d 52, 54 (3d Cir.1983). When governmental authority dominates the activities of a private entity to such an extent that the entity is deemed to act with the authority of the government, however, the entity will be subject to constitutional restraints. *See Edmonson v. Leesville Concrete Co., Inc.,* —— U.S. ——, ——, 111 S.Ct. 2077, 2082, 114 L.Ed.2d 660 (1991).

Determining whether the conduct of a private entity should be attributed to the federal government requires employment of the two-part "state action" analysis set forth by the Supreme Court in *Lugar v. Edmondson Oil,* 457 U.S. at 937–42, 102 S.Ct. at 2753–56. *See Leesville Concrete,* —— U.S. at —— –——, 111 S.Ct. at 2082–83. The *Lugar* framework requires that this Court ask "first whether the claimed constitutional deprivation resulted from the exercise of a right or privilege having its source in [federal] ... authority; and second, whether the private party charged with the deprivation could be described in all fairness as a [federal] ... actor." *Leesville Concrete,* —— U.S. at —— –——, 111 S.Ct. at 2082–83 (applying *Lugar*) (citations omitted).

As to the first part of this analysis, plaintiffs claim that defendants, admittedly private entities, should be held subject to the restraints of the federal Constitution because their alleged activities have been countenanced by the federal government through (1) the unique exemption of Baseball from liability under the federal antitrust laws—an exemption first conferred upon Baseball by the U.S. Supreme Court in *Federal Baseball Club of Baltimore, Inc. v. National League of Professional Baseball Clubs,* 259 U.S. 200, 42 S.Ct. 465, 66 L.Ed. 898 (1922), and later reaffirmed by the Court in *Toolson v. New York Yankees,* 346 U.S. 356, 74 S.Ct. 78, 98 L.Ed. 64 (1953), and *Flood v. Kuhn,* 407 U.S. 258, 92 S.Ct. 2099, 32 L.Ed.2d 728 (1972);[6] and (2) congressional desire, expressed by its "positive inaction," *Flood,* 407 U.S. at 283–84, 92 S.Ct. at 2112–13, not to disapprove of these cases legislatively. With respect to the second prong of the *Lugar* analysis, plaintiffs assert in circuitous fashion that it would be "eminently fair" to describe Baseball as a federal actor because Baseball would not have committed the acts alleged were it not for the *Federal Baseball* antitrust exemption. *See* Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Complaint at 27.

Baseball does not dispute that plaintiffs plead adequately that its alleged actions resulted, in part, from the perceived comfort afforded by the *Federal Baseball* antitrust exemption. But Baseball contends that there must be more than a mere allegation that a private entity acted pursuant to federal law or a federal judicial decision before the entity's actions can be attributed to the federal government. I agree.

The Supreme Court decisions in this area have held uniformly that "a government 'normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice [of the defendant] must in law be deemed to be that of the [government].'" *San Francisco Arts & Athletics, Inc. v. United States Olympic Comm.,* 483 U.S. 522, 546, 107 S.Ct. 2971, 2986, 97 L.Ed.2d 427 (1987) (quoting *Blum v. Yaretsky,* 457 U.S. 991, 1004, 102 S.Ct. 2777, 2786, 73 L.Ed.2d 534 (1982)). Baseball's alleged efforts to defame plaintiffs and otherwise prevent them from acquiring and relocating the Giants simply cannot be attributed to the federal govern-

---

**6.** The scope and nature of this exemption are discussed at Section D.3., *infra.*

ment under this standard. Plaintiffs do not plead that the federal government coerced Baseball into behaving in this manner; nor do they plead that either *Federal Baseball* and its progeny or "positive inaction" by Congress has in any way provided significant encouragement to Baseball to do so.

The closest plaintiffs come to pleading significant governmental encouragement appears in the following paragraph of their complaint: "The federal antitrust exemption has permitted Major League Baseball to operate free of the legal restraints applicable to other interstate businesses and has thus enabled, *encouraged* and created the framework for the conduct of defendants complained of herein." Complaint at ¶ 74 (emphasis added). Simply uttering the word "encouraged," however, is not enough to equate Baseball's actions with those of the federal government. The so-called encouragement alluded to in this paragraph is explained by plaintiffs themselves in the preceding clause as flowing solely from a judicially-created antitrust exemption, "which has *permitted* Baseball to operate free of the legal restraints applicable to other interstate businesses." *Id.* (emphasis added). Thus the governmental involvement alleged here can, at best, be viewed as mere acquiescence, as opposed to the "significant," active encouragement required to adequately link defendants' actions to the federal government. *See United States Olympic Comm.,* 483 U.S. at 547, 107 S.Ct. at 2986 (mere governmental approval of or acquiescence in conduct of private entity insufficient to equate private entity's actions with those of the federal government).

In essence, plaintiffs claim that Baseball's actions should be attributed to the federal government solely because the federal government allegedly has exempted Baseball from the antitrust laws. But such reasoning was flatly rejected by the Supreme Court in *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974). There, the Court affirmed dismissal of a civil rights complaint proceeding under 42

U.S.C.A. § 1983 because the defendant private utility could not be viewed as a state actor. In so doing, the Court expressly rejected the plaintiff's contention that the private utility was a state actor because it enjoyed state-created monopoly status under the antitrust laws. *Jackson,* 419 U.S. at 351–52, 95 S.Ct. at 453–54. The Court's analysis in *Jackson* is equally applicable here, where plaintiffs charge Baseball as a federal actor solely because it enjoys an alleged exemption from federal antitrust laws. *Cf. United States Olympic Comm.,* 483 U.S. at 547, 107 S.Ct. at 2986–87 (Congress's conferral upon private entity of exclusive right under trademark laws to use of term "Olympic" not enough to make private entity's choice of how to enforce that right a governmental decision). *Compare Leesville Concrete,* —— U.S. at ——, 111 S.Ct. at 2085 (private party using preemptory challenges to exclude jurors on basis of race found to be a governmental actor because of, *inter alia,* "*direct and indispensable participation of the judge*" (emphasis added)). I will therefore dismiss plaintiffs' direct constitutional claims under Fed.R.Civ.P. 12(b)(6) for failure to state a cause of action.

## C. *42 U.S.C.A. § 1983*

█ To state a civil rights claim under 42 U.S.C.A. § 1983, plaintiffs must plead that Baseball (1) deprived them of a right secured by the Constitution or laws of the United States while (2) acting under color of state law. *See, e.g., Flagg Bros., Inc. v. Brooks,* 436 U.S. 149, 155, 98 S.Ct. 1729, 1732–33, 56 L.Ed.2d 185 (1978); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 150, 90 S.Ct. 1598, 1604–05, 26 L.Ed.2d 142 (1970). With regard to the first element, plaintiffs plead that Baseball deprived them of rights secured by Article IV, Section 2[7] of the U.S. Constitution and the First, Fifth, and Fourteenth Amendments. In particular, plaintiffs claim that Baseball (a) denied them the right to participate in the purchase of a Major League Baseball team from an owner who contracted to sell the team to plaintiffs; (b) impaired their liberty interest in their reputations by

---

**7.** "The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." U.S. Const. art. IV, § 2, cl. 1.

impugning their good names, honor, and integrity and foreclosing their personal, business, and occupational opportunities; and (c) discriminated against them on the basis of their state residence and ethnic heritage and denied them equal protection of the laws.

As to the second element of § 1983, plaintiffs aver that Baseball acted under color of state law because (a) Baseball is exempt from liability under state antitrust laws; (b) there is a symbiotic relationship and close nexus between Baseball and state and local governments; and (c) Baseball acted in concert with the City of San Francisco to prevent the Giants from being relocated.

██ Baseball focuses its motion to dismiss solely upon the second element of § 1983, arguing that plaintiffs have not sufficiently pled that Baseball acted under color of state law. Because I conclude that plaintiffs have sufficiently pled that Baseball acted in concert with the City of San Francisco to deprive them of their constitutionally protected rights, I will address at length only that portion of plaintiffs' complaint, and deny Baseball's motion as to plaintiffs' § 1983 claims.

██ A private defendant's joint participation with a state official in a conspiracy to deprive another of constitutionally protected rights constitutes both state action essential to show a direct violation of a plaintiff's rights and action "under color of state law" for purposes of § 1983. *See Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 931, 102 S.Ct. 2744, 2750, 73 L.Ed.2d 482 (1982) (explaining *Adickes*, 398 U.S. 144, 90 S.Ct. 1598). In their complaint, plaintiffs plead the following facts:

> On information and belief, the City of San Francisco through its officials and Major League Baseball have colluded to keep the Giants in San Francisco by, *inter alia*:

· · · · ·

(c) The City of San Francisco has sought to induce the Giants not to relocate by agreeing to indemnify both (i) the team's present owner in connection with any actions filed against him relating to the sale of the team and (ii) potential investors competing with the Partnership to purchase the Giants. In turn, potential investors have agreed to indemnify Major League Baseball against legal liability relating to purchase of the Giants. San Francisco, therefore, in effect agreed to indemnify Major League Baseball in connection with the sale of the Giants.

Complaint at ¶ 97.

In addition to these averments, plaintiffs direct the Court to the following public testimony of San Francisco Mayor Frank M. Jordan before a December 10, 1992 hearing of the United States Senate Subcommittee on Antitrust, Monopolies and Business Rights:

> In early September [1992], I [Mayor Jordan] went to New York to meet with Bill White, the President of the National League. I told Mr. White that the City [of San Francisco] had *a vital economic interest* in the Giants franchise and had important contractual rights under the Stadium Lease. *Without giving us any assurance of success, Mr. White told me that the League would consider a competing offer from San Francisco.* Under the agreement to sell the Giants to Florida interests, the Giants owner allegedly promised to refuse to deal with all other [sic] who wanted to buy the team, even with those from San Francisco. *Without the League's intervention, we would not have been permitted to submit a competing offer* and the voices of Giants fans in San Francisco would not have been heard or considered. I cannot begin to tell you the amount of time and work that my staff and other officials of our city government devoted to this effort. I can tell you, however, that it was and continues to be worth every minute....[8]

---

8. Although this testimony is not included with plaintiffs' complaint, the parties agreed at oral argument that it may be treated by the Court as being part of the complaint for purposes of this motion, thus avoiding the need to convert Baseball's motion under Fed.R.Civ.P. 12(b) into a

motion for summary judgment. I note, however, that even without such an agreement, the Court may take judicial notice of matters of public record, such as Mayor Jordan's testimony, without converting a motion to dismiss into a motion for summary judgment. *See, e.g., Mack v. South*

*Hearings on "Baseball's Antitrust Immunity" Before the Subcomm. on Antitrust, Monopolies and Business Rights of the Senate Comm. on the Judiciary,* 102d Cong., 2d Sess. (Dec. 10, 1992) (prepared statement of Hon. Frank M. Jordan, Mayor, City and County of San Francisco) (emphasis added).

Baseball argues that the above allegations and testimony are insufficient to allege a conspiracy between Baseball and the City of San Francisco for purposes of § 1983's "under color of state law" element because plaintiffs do not plead with "sufficient particularity" that an agreement between Baseball and the City of San Francisco had been reached. I disagree.

Federal Rule of Civil Procedure 8(a)(2) requires that pleadings contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). Under this Rule, the complaint must provide the defendant with "fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957). Despite Baseball's citation of lower court decisions to the contrary, the Supreme Court has reiterated recently that a federal court may not apply a pleading requirement more stringent than that provided for in the Federal Rules of Civil Procedure, even in § 1983 litigation. *See Leatherman v. Tar-rant Cty. Narcotics Intelligence & Coordination Unit,* —— U.S. ——, ——, 113 S.Ct. 1160, 1163, 122 L.Ed.2d 517 (1993). The Court explained in *Leatherman* that unless the Federal Rules provide for heightened specificity,[9] "federal courts and litigants must rely on summary judgment and control of discovery to weed out unmeritorious claims sooner rather than later." *Id.*

Plaintiffs in this case have gone far beyond merely providing Baseball with fair notice of their claim and the grounds upon which it rests. Not only do they allege that the City of San Francisco colluded with Baseball in deprivation of their rights, but they also plead specifically that the City went so far as to indemnify Baseball from liability for its actions in connection with the sale of the Giants. And plaintiffs offer testimony from San Francisco's Mayor of that city's direct pleas to Baseball to interfere with the sale and transfer, as well as testimony that Baseball ultimately did interfere. I find such allegations, which must be accepted as true on a motion to dismiss, more than adequate to create at least a reasonable inference that Baseball and the City of San Francisco "reached an understanding," *Adickes,* 398 U.S. at 152, 90 S.Ct. at 1604, to interfere with plaintiffs' constitutionally protected rights.[10] Plaintiffs plead sufficient facts from which to conclude that Baseball may have acted "under color of state law,"[11] and I will therefore

---

*Bay Beer Distrib., Inc.,* 798 F.2d 1279, 1282 (9th Cir.1986); 5A Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure,* § 1364 (1990).

**9.** Rule 9(b), for example, requires that averments of fraud or mistake be pled with particularity. Fed.R.Civ.P. 9(b).

**10.** As stated above, Baseball's motion to dismiss focuses solely upon the second element of § 1983—whether plaintiffs adequately plead that Baseball acted under color of state law by conspiring with the City of San Francisco. It challenges neither plaintiffs' averments that the alleged object of the conspiracy was in deprivation of plaintiffs' constitutionally protected rights, nor whether plaintiffs have adequately stated a cause of action for deprivation of such rights. Accordingly, I have no occasion to address the substantive constitutional allegations of plaintiffs' complaint.

**11.** I also conclude that plaintiffs adequately plead that Baseball acted "under color of state law" under the so-called "close nexus" test, which examines a government's link to the challenged action and asks whether the actions of a private entity may be attributed to the state. *See Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 351, 95 S.Ct. 449, 453–54, 42 L.Ed.2d 477 (1974). Discussed above with respect to plaintiffs' direct constitutional claims, the "close nexus" test requires a determination of whether the government—the state in § 1983 litigation—" 'has exercised coercive power or has provided such *significant encouragement,* either overt or covert, that the choice [of a private entity] must in law be deemed to be that of the [government].' " *San Francisco Arts & Athletics, Inc. v. United States Olympic Committee,* 483 U.S. 522, 546, 107 S.Ct. 2971, 2986, 97 L.Ed.2d 427 (1987) (quoting *Blum v. Yaretsky,* 457 U.S. 991, 1004, 102 S.Ct. 2777, 2785–86, 73 L.Ed.2d 534 (1982)) (emphasis added).

Plaintiffs allege that the City of San Francisco sought to induce the Giants not to relocate by agreeing to, in effect, indemnify Baseball against legal liability relating to the purchase of the

deny Baseball's motion to dismiss plaintiffs' § 1983 claim.[12]

## D. *Antitrust*

Baseball next moves to dismiss plaintiffs' claims under sections 1 and 2 of the Sherman Anti–Trust Act ("Sherman Act"), 15 U.S.C.A. §§ 1 and 2 (West 1973 & Supp.1993),[13] and offers the following three reasons why these claims should be dismissed: (1) plaintiffs have failed to allege that Baseball's actions restrained competition in a relevant market; (2) plaintiffs have no standing to assert a Sherman Act claim; and (3) Baseball is ex-empt from liability under the Sherman Act. I will address each argument in turn.

### 1. *Relevant Market*

Absent a *per se* violation, which neither party argues has been alleged here, a cause of action under the Sherman Act re-quires, *inter alia*, an allegation of injury to competition in relevant product and geo-graphic markets. *See Mid–South Grizzlies v. National Football League*, 720 F.2d 772, 785–88 (3d Cir.1983), *cert. denied*, 467 U.S. 1215, 104 S.Ct. 2657, 81 L.Ed.2d 364 (1984); *Fleer Corp. v. Topps Chewing Gum, Inc.*, 658 F.2d 139, 147 (3d Cir.1981).[14] Baseball ar-

---

Giants. Additionally, the Mayor of San Francis-co has testified in public that he pleaded with Baseball to intervene in the sale and transfer. It certainly would be reasonable to infer from these allegations, which I must accept as true on a motion to dismiss, that the City of San Francisco sought to actively encourage at least some of the allegedly unlawful actions taken by Baseball in this case. I find such encouragement, particu-larly the alleged financial indemnification of le-gal liability for these actions, to be just the sort of "significant encouragement" necessary to deem the actions of Baseball to be those of the City of San Francisco. And where the challenged con-duct constitutes "state action," as it may here, that conduct is deemed to be conduct "under color of state law and will support a suit under § 1983." *Lugar*, 457 U.S. at 935, 102 S.Ct. at 2752.

Having based my decision to deny Baseball's motions on two alternative grounds, I do not address whether Baseball and the various politi-cal subdivisions where the game is played are so intertwined as to create a "symbiotic relation-ship" sufficient to deem Baseball's actions to have been taken under color of state law. Nor do I address whether Baseball's alleged exemp-tion from *state* antitrust laws, in itself, makes Baseball's actions similarly attributable to the state.

12. I reject Baseball's eleventh hour assertion that plaintiffs have no standing to sue under § 1983 because plaintiffs were "merely potential inves-tors" in an allegedly injured partnership, giving only the Partnership entity standing to maintain such an action. As sole support for this argu-ment Baseball cites *Erlich v. Glasner*, 418 F.2d 226 (9th Cir.1969), which held that a shareholder lacks standing to bring a § 1983 action on behalf of a corporation in which he holds shares. There are two difficulties with Baseball's argu-ment. First, plaintiffs here are partners in a partnership, not shareholders of a corporation. Second, and perhaps more important, the Ninth Circuit after *Glasner* held that "a shareholder does have standing when he or she has been injured directly and independently of the corpo-ration." *Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1318 (9th Cir.1989). Plaintiffs Piaz-za, Tirendi, and PTB plead repeatedly through-out their complaint that *their* own constitutional rights have been infringed and that they seek redress under § 1983 only for those infringe-ments.

13. In particular, plaintiffs allege the following: (1) Baseball's actions "have placed direct and indirect restraints on the purchase, sale, transfer and relocation of Major League Baseball teams and on competition in the purchase, sale, trans-fer and relocation of such teams, all of which directly and indirectly affect interstate com-merce," Complaint at ¶ 104; (2) "Major League Baseball is an unreasonable and unlawful mo-nopoly created, intended and maintained by de-fendants for the purpose of permitting defendant team owners, an intentionally select and limited group, to reap enormous profits," *id.* at ¶ 110; and (3) Baseball has achieved these restraints on trade and its monopoly status by engaging in "an unlawful combination and conspiracy ... the substantial terms of which have been to elimi-nate all competition in the relevant market [de-fined as the market for American League and National League baseball teams], to exclude plaintiffs from participating in the relevant mar-ket, to establish monopoly control of the relevant market and to unreasonably restrain trade by denying the sale, transfer and relocation of the Giants to the Tampa Bay area," *id.* at ¶ 111. The effect of Baseball's actions, plaintiffs allege, has been, among other things, to restrain their right to engage in the business of Major League Base-ball, restrain their right to competitively bid on Major League Baseball teams, and cause plain-tiffs to lose contract rights and profits. *Id.* at ¶ 112.

14. For a concise discussion of the distinction between a *per se* violation of the Sherman Act and the so-called rule of reason analysis applica-ble to resolution of most Sherman Act cases, see *Business Electronics Corp. v. Sharp Electronics Corp.*, 485 U.S. 717, 723–24, 108 S.Ct. 1515, 1518–20, 99 L.Ed.2d 808 (1988). Aside from

gues that plaintiffs have not alleged an injury to competition in a relevant product market because plaintiffs were seeking to *join* Baseball, rather than *compete* with it.

In support of this proposition, Baseball relies heavily upon the Third Circuit's holding in *Mid–South Grizzlies*. Plaintiffs in that case, the Mid–South Grizzlies (the "Grizzlies"), were a joint venture located in Memphis, Tennessee that owned a team in the World Football League ("WFL"). *Mid–South Grizzlies*, 720 F.2d at 775–76. After the WFL's demise, the Grizzlies applied for admission to the National Football League ("NFL"). *Id.* The NFL rejected the Grizzlies' application, and the Grizzlies subsequently brought suit against the NFL under sections 1 and 2 of the Sherman Act. *Id.* The Third Circuit affirmed the district court's entry of summary judgment in favor of the NFL because, *inter alia*, "the Grizzlies [had] shown no actual or potential injury to competition resulting from the rejection of their application for an NFL franchise." *Id.* at 787.

The Grizzlies had identified the relevant product market for Sherman Act purposes as "major-league professional football." *Id.* at 783. The NFL argued that denial of the Grizzlies' franchise application could not have injured competition in this product market because there was no economic competition among league members capable of injury. *Id.* at 786. The Third Circuit agreed in part, finding on the record before it no evidence of economic competition between a potential NFL franchise located in Memphis, Tennessee and the nearest team geographically (280 miles away in St. Louis, Missouri). The court expressly declined, however, to hold that there could never be intra-league competition, noting that it was conceivable that "within certain geographic submarkets two league members [could] compete with one another for ticket buyers, for local broadcast revenue, and for sale of the concession items

like food and beverages and team paraphernalia." *Id.* at 787 (footnote omitted). Baseball argues on the basis of this decision that it could not have injured competition in a relevant product market. I disagree.

There are two important distinctions between *Mid–South Grizzlies* and the instant case. First, unlike the Grizzlies, plaintiffs here were not seeking to join Major League Baseball through *creation* of a franchise but were attempting to purchase an *existing* team. The import of this distinction turns upon the second distinction, which is that also unlike the Grizzlies, who identified the relevant product market as major-league professional football generally, plaintiffs here have identified the relevant product market as the market for existing American League and National League baseball *teams*. In other words, plaintiffs allege injury to competition in the team franchise market (the market for ownership of professional baseball teams, and the market for ownership of the Giants in particular). They do not seek to redress injury to an intra-league market comprised of Major League Baseball generally, which plaintiffs sought to join through the purchase of a franchise, and which may or may not include competition among present franchise owners. Plaintiffs aver that they were competing in the team franchise market with other potential investors located primarily *outside* of Major League Baseball for ownership of the Giants, and that Baseball interfered directly and substantially with competition in that market. I therefore reject Baseball's contention that plaintiffs have failed to allege a restraint on competition in a relevant product market. *See Fishman v. Estate of Wirtz*, 807 F.2d 520, 532 n. 9 (7th Cir.1986) (stating in antitrust action brought by jilted suitors of the Chicago Bulls basketball team that the "national sports franchise market could be a relevant market" for Sherman Act purposes) (dictum).[15] *Mid–South*

---

determining whether plaintiffs must allege a loss of competition in relevant markets, which plaintiffs readily concede they must do, the distinction is not relevant to Baseball's motion to dismiss.

**15.** *Wirtz* also stands for the proposition that a relevant product market may be defined as a market *for* which the parties compete, as op-

posed to one *in* which they compete. *Wirtz*, 807 F.2d at 531 (citing *Otter Tail Power Co. v. United States*, 410 U.S. 366, 369, 93 S.Ct. 1022, 1025, 35 L.Ed.2d 359 (1973)). Thus a party may prevail under the Sherman Act if it was unlawfully excluded *from* a market, such as the market identified in *Wirtz* as the market for presentation of live basketball in Chicago, even if that party

*Grizzlies* is therefore entirely distinguishable from the instant case.[16]

### 2. *Standing*

■ The principles of standing applicable to alleged violations of sections 1 and 2 of the Sherman Act are the same as those applicable to questions of standing under section 4 of the Clayton Act, 15 U.S.C.A. § 15 (West Supp.1993). *See Bogus v. American Speech & Hearing Ass'n,* 582 F.2d 277, 288 n. 13 (3d Cir.1978). "In addressing the 'standing' of parties to bring a claim under § 4 of the Clayton Act, the Supreme Court has focused on the nexus between the antitrust violation and the plaintiff's harm and on whether the harm alleged is of the type for which Congress provides a remedy." *In re: Lower Lake Erie Iron Ore Antitrust Litig.,* 998 F.2d 1144, 1163 (3d Cir.1993, as corrected June 15, 1993). In *Associated Gen. Contractors, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 545, 103 S.Ct. 897, 913, 74 L.Ed.2d 723 (1983) ("*AGC*"), the Supreme Court outlined a multi-factor inquiry to analyze nexus questions for purposes of standing under § 4 of the Clayton Act. As characterized recently by the Third Circuit, the *AGC* standing factors are as follows:

(1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing; (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress; (3) the directness of the injury, which addresses the concerns that liberal application of standing principles might produce speculative claims; (4) the existence of more direct victims of the alleged antitrust violations; and (5) the potential for duplicative recovery or complex apportionment of damages.

---

never met, nor intended to meet, the defendants in direct competition within that market. Plaintiffs argue here that they were competing with others outside Major League Baseball to join Major League Baseball and that *Wirtz* requires recognition that Baseball's alleged interference with that competition could be actionable under the Sherman Act. I agree.

Plaintiffs also argue that this case may fall into the exception noted by the Third Circuit in *Mid–South Grizzlies* (that intra-league competition between certain teams for ticket-purchasers, concessions, etc. conceivably may exist). Plaintiffs assert that if their antitrust claim survives Baseball's motion to dismiss, they will elicit evidence during discovery that defendant Florida Marlins, Inc. (the "Marlins")—owner of a National League expansion team located in Miami, Florida—colluded unlawfully with unnamed others to keep the Giants out of Florida in an effort to preserve the Marlins' alleged monopoly in that state over Major League Baseball television rights, fans, and concessions. To buttress this assertion, which does not appear in their complaint, plaintiffs have submitted several copies of newspaper articles that speculate or charge that the owner of the Marlins, Wayne Huizenga, engaged in such collusion. Although I am persuaded conceptually by plaintiffs' theory, I cannot base my holding upon it because their complaint does not even allude to such a scheme, nor do plaintiffs define as a relevant product market the market for baseball fans, television rights and concessions in the State of Florida. I note in this regard that plaintiffs have not filed for leave to amend their complaint to pursue such a theory.

**16.** Similarly distinguishable are *Seattle Totems Hockey Club, Inc. v. National Hockey League,* 783 F.2d 1347 (9th Cir.), *cert. denied,* 479 U.S. 932, 107 S.Ct. 405, 93 L.Ed.2d 357 (1986), and *Levin v. National Basketball Ass'n,* 385 F.Supp. 149 (S.D.N.Y.1974). Unlike the instant case but similar to *Mid–South Grizzlies, Seattle Totems* was an antitrust action arising from an unsuccessful attempt by the plaintiff in that case to join the National Hockey League ("NHL") through the *creation* of a franchise. The Ninth Circuit affirmed the district court's dismissal of the plaintiff's Sherman Act claim in part because the plaintiffs sought to join the NHL rather than compete with it. *Seattle Totems* is thus distinguishable because competition in the markets for ownership of existing franchises or participation in the NHL was not at issue.

Closer to the facts in this case, *Levin* involved an antitrust action filed by plaintiffs who sought to purchase an existing professional sports franchise—the Boston Celtics basketball team. The district court granted summary judgment in favor of the defendants in that case because, *inter alia,* the plaintiffs wanted to join the National Basketball Association rather than compete with it. The district court's opinion, however, gives no indication that either the plaintiffs asserted or that the court considered a claim that competition had been restrained in the markets for professional basketball teams or for participation in professional basketball. (I also note in passing that the Third Circuit in *Mid–South Grizzlies* called into question the suggestion in *Levin* that there could never be competition among league members. *See Mid–South Grizzlies,* 720 F.2d at 787 n. 9.)

*Lower Lake Erie,* at 1165–66. These factors must be considered and balanced in light of the unique circumstances of each case. *See Merican, Inc. v. Caterpillar Tractor Co.,* 713 F.2d 958, 965 (3d Cir.1983), *cert. denied,* 465 U.S. 1024, 104 S.Ct. 1278, 79 L.Ed.2d 682 (1984).

Without directly addressing the *AGC* factors, Baseball posits two reasons why plaintiffs lack Sherman Act standing. First, Baseball contends that plaintiffs' antitrust claim can be boiled down to Baseball's rejection of the Partnership's application to acquire and transfer the Giants. Thus, Baseball argues, any claim arising out of an alleged restraint on competition belongs only to the Partnership entity, not plaintiffs individually. Second, Baseball asserts that the only direct harm allegedly suffered by plaintiffs independent of their interest in the Partnership was the alleged injury to their reputation, a harm not actionable under the Sherman Act. I view the first of Baseball's arguments as focusing upon the first, third and fourth *AGC* factors, and the second of Baseball's arguments as focusing upon the second *AGC* factor.

### a. *Directness of injury, causation and other victims*

The directness of injury and causation for antitrust standing purposes depends upon whether the plaintiff has alleged a direct causal connection between the defendant's purported antitrust activity and the plaintiff's alleged harm. *See AGC,* 459 U.S. at 540–42, 103 S.Ct. at 909–11; *Lower Lake Erie,* at 1166–67. Plaintiffs identify the antitrust activity here as Baseball's alleged conspiracy to intentionally monopolize and restrain competition in the market for ownership of Major League Baseball teams, the Giants in particular. Plaintiffs allege that these unlawful activities have resulted in (1) the elimination of plaintiffs and organizations in which plaintiffs owned majority interests from competition in this market; (2) the exclusion of plaintiffs and their organizations from engaging in the business of Major League Baseball; and (3) loss of plaintiffs' contractual and property rights.

Baseball argues that plaintiffs' alleged injury is, at best, indirect because only the Partnership, not plaintiffs, could have been affected. Although this contention may prove factually correct after the case has developed, I cannot find sufficient support in plaintiffs' complaint to agree. Plaintiffs plead that they were *individually* excluded by Baseball from the relevant product market and suffered damages as a result. For example, plaintiffs Piazza and Tirendi allege that Baseball schemed to prevent the transfer of the Giants to Florida by unlawfully excluding them first individually, as the financial backbone of the Partnership, from the market for the Giants (and other Major League Baseball teams), only later to target the financially weakened Partnership and the remaining Investors. Thus the plaintiffs, not just the Partnership, sustained the injuries for which they seek redress.

In support of its position that the Partnership is a more direct victim, Baseball relies upon several decisions that stand for the familiar proposition that

> [a] stockholder of a corporation does not acquire standing to maintain an [antitrust] action in his own right, as a shareholder, when the alleged injury is inflicted upon the corporation and the only injury to the shareholder is the indirect harm which consists in the diminution in value of his corporate shares resulting from the impairment of corporate assets.

*Kauffman v. Dreyfus Fund, Inc.,* 434 F.2d 727, 732 (3d Cir.1970), *cert. denied,* 401 U.S. 974, 91 S.Ct. 1190, 28 L.Ed.2d 323 (1971). *See also, e.g., Rand v. Anaconda–Ericsson, Inc.,* 794 F.2d 843, 849 (2d Cir.), *cert. denied,* 479 U.S. 987, 107 S.Ct. 579, 93 L.Ed.2d 582 (1986). But such decisions, even if they apply with equal force to partners and partnership entities,[17] are inapposite. It is true that

---

17. *Compare Klebanow v. New York Produce Exchange,* 344 F.2d 294 (2d Cir.1965) ("[W]hen business is conducted by a partnership, the [Clayton Act] views the partnership rather than a partner as the person injured.") *with Kauffman,* 434 F.2d at 733 ("Nowhere ... do we find authority for the proposition that [a shareholder is vested in a share of his corporation's right to sue]. To accept this would be to convert an orthodox corporate structure to a general partnership or joint venture with each participant a principal and agent for the others.")

plaintiffs cite injury to the Partnership as a consequence of Baseball's antitrust behavior; but they also identify unique, particularized injury to themselves. As I read their complaint, plaintiffs do not seek to redress a diminution in the value of their interest in the Partnership or any other wrong that befell the Partnership *per se.* They seek to redress Baseball's allegedly unlawful exclusion of Vincent Piazza, Vincent Tirendi, and PTB from competing in a relevant market. I therefore find that the first, third, and fourth *AGC* factors weigh strongly in plaintiffs' favor.

### b. *Goal of antitrust laws*

Baseball next contends that the only harm plaintiffs allege independent of the Partnership is harm to their reputations. Again, I must disagree. As discussed above, plaintiffs seek to redress damages sustained as a result of Baseball's alleged exclusion of them from a relevant market. Such injuries are clearly of the type that Congress sought to redress through the antitrust laws. The Supreme Court has repeatedly stated that a central purpose of the Sherman Act is to protect "the economic freedom of participants in the relevant market." *AGC,* 459 U.S. at 538, 103 S.Ct. at 908. Thus, the second *AGC* factor favors plaintiffs.

### c. *Duplicative Recovery and Complex Apportionment*

Although the parties do not address the fifth *AGC* factor—the potential for duplicative recovery or complex apportionment of damages—I conclude that this factor, too, weighs in favor of plaintiffs. Were plaintiffs suing on behalf of the Partnership, I can conceive of a situation where multiple recoveries would be possible to the extent that the other Investors are not parties to this litigation. As noted above, however, that is not the case. Plaintiffs seek to redress their own particular injuries; thus there appears no risk of duplicative recoveries or complex apportionment of damages. Finding that each of the *AGC* factors weighs in favor of plaintiffs, I therefore reject Baseball's contention that plaintiffs lack standing to press a Sherman Act claim.

### 3. *Exemption from Antitrust Liability*

██ I now turn to the heart of Baseball's motion to dismiss plaintiffs' Sherman Act claim—that in *Federal Baseball Club of Baltimore, Inc. v. National League of Professional Baseball Clubs, Inc.,* 259 U.S. 200, 42 S.Ct. 465, 66 L.Ed. 898 (1922); *Toolson v. New York Yankees,* 346 U.S. 356, 74 S.Ct. 78, 98 L.Ed. 64 (1953); and *Flood v. Kuhn,* 407 U.S. 258, 92 S.Ct. 2099, 32 L.Ed.2d 728 (1972), the United States Supreme Court exempted Baseball from liability under the federal antitrust laws. Plaintiffs do not deny that these cases recognize some form of exemption from antitrust liability related to the game of baseball, but argue alternatively that the exemption either does not apply in this case, cannot be applied as a matter of law to the facts of this case, or should no longer be recognized at all.

### a. *Evolution of the exemption*

Writing for a unanimous Supreme Court over seventy years ago, Justice Holmes affirmed a judgment of the Court of Appeals of the District of Columbia and held that the business of giving exhibitions of baseball games for profit does not constitute trade or commerce within the meaning of the Sherman Act, and thus the Act does not apply to that business. *See Federal Baseball,* 259 U.S. at 208–09, 42 S.Ct. at 465–66, and the underlying decision of the Court of Appeals, *National League of Professional Baseball Clubs v. Federal Baseball Club of Baltimore, Inc.,* 269 F. 681 (C.C.D.C.1920) (*"D.C. Opinion"*). The plaintiff in that case, Federal Baseball of Baltimore, Inc. ("Federal Baseball"), owned a franchise in the Federal League of Professional Baseball Clubs until dissolution of that league in 1915 pursuant to an agreement with the National League and American League of Professional Baseball Clubs. *D.C. Opinion,* 269 F. at 682. With the demise of the Federal League, Federal Baseball was left without an organization within which to compete, and subsequently brought suit against the National and American Leagues, among others, for violation of the Sherman Act. *Id.* A jury found in favor of Federal Baseball, awarding it $240,000 in treble damages, costs, and attorneys fees.

The gravamen of Federal Baseball's case was the alleged anticompetitive impact of what is known as the "reserve clause" in the yearly contracts of players in the National and American Leagues. *Id.* at 687–88. The reserve clause bound a player to either enter a new contract with the same team in the succeeding year of the player's contract or be considered ineligible by the National and American Leagues to serve any baseball club. *Id.* at 687. Because of this restrictive provision, the Federal League and its constituent clubs were unable to obtain players who had contracts with the National and American Leagues, the effect of which, as found by the jury, was to damage Federal Baseball. *Id.* at 682, 687.

The Court of Appeals reversed the jury's verdict and remanded, making four significant findings. First, and quite simply, the court found that the business in which the defendants were engaged was the business of giving exhibitions of the game of baseball. *Id.* at 684.

Second, the court found that "[a] game of baseball is not susceptible of being transferred, ... [and] [t]he transportation in interstate commerce of the players and the paraphernalia used ... was but an incident to the main purpose of the [defendants], namely, the production of the game." *Id.* at 684–85. Thus, the court reasoned, a baseball exhibition could not be considered interstate commerce, and the business of giving such an exhibition could not be subject to the Sherman Act. *Id.*

The third finding of the Court of Appeals was that, despite the fact that the giving of an exhibition was not interstate commerce, there were interstate components of Federal Baseball's business, the direct interference with which was redressable under the Sherman Act. *Id.* at 686. These interstate features included such things as the movement of players and their paraphernalia from place to place across state lines. *Id.* The court found that if unlawful anticompetitive activity directly interfered with the business of moving the players or their equipment, as op-

posed to the exhibition of the game itself, the Sherman Act would apply. *Id.*

Finally, the Court of Appeals found that the reserve clause only indirectly, if at all, affected the interstate aspects of Federal Baseball's business (the business of moving players and their equipment), which was not sufficient to give rise to a Sherman act violation. *Id.* at 687–88.

These four findings can be condensed into two reasons why the Court of Appeals found that the reserve clause did not offend the Sherman Act. First, the anticompetitive impact of the reserve clause on the business of giving a baseball exhibition was not redressable as a matter of law under the Sherman Act, such business found not to be interstate commerce. Second, the reserve clause had, at best, only an incidental impact on the portion of Federal Baseball's business that was considered interstate commerce.

The Supreme Court affirmed. The Court agreed that the defendants' exhibitions of baseball games "are purely state affairs," lacking the character of interstate commerce. *Federal Baseball,* 259 U.S. at 208, 42 S.Ct. at 466. From this, the Court reasoned, "[i]f we are right the plaintiff's business is to be described the same way and the restrictions by contract that prevented the plaintiff from getting players to break their bargains [the reserve clause] and the other conduct charged against the defendants [buying up Federal League clubs] were not an interference with commerce among the States." *Id.* at 209, 42 S.Ct. at 466.

The Supreme Court next addressed the exemption in *Toolson v. New York Yankees, Inc.,* 346 U.S. 356, 74 S.Ct. 78, 98 L.Ed. 64 (1953), a *per curiam* opinion affirming decisions of the Sixth and Ninth Circuits.[18] The plaintiffs in the underlying cases were professional baseball players who brought suit under the federal antitrust laws alleging harm by virtue, again, of the reserve clause. *Id.* at 362, 74 S.Ct. at 81 (Burton, J. dissenting). Seeking to avoid *Federal Baseball,* the plaintiffs stressed, among other things, the

---

**18.** *See Toolson v. New York Yankees, Inc.,* 101 F.Supp. 93 (S.D.Cal.1951), *aff'd without opinion,* 200 F.2d 198 (9th Cir.1952); *Kowalski v. Chan-* *dler,* 202 F.2d 413 (6th Cir.1953); *Corbett v. Chandler,* 202 F.2d 428 (6th Cir.1953).

obsolescence of that decision in light of the increased revenue generated by baseball due to interstate radio and television broadcasts. *See Toolson v. New York Yankees,* 101 F.Supp. 93. Unpersuaded by this position, the district courts dismissed the claims and the Courts of Appeals affirmed. The plaintiffs then petitioned the Supreme Court to overturn *Federal Baseball.* In a terse opinion, the Court refused, upholding *Federal Baseball* "so far as that decision determines that Congress had no intention of including the business of baseball within the scope of the federal antitrust laws." *Toolson,* 346 U.S. at 357, 74 S.Ct. at 79 (*per curiam*).

Following *Toolson,* several attempts were made to extend its reasoning and that of *Federal Baseball* beyond the context of baseball. *See, e.g., United States v. Shubert,* 348 U.S. 222, 75 S.Ct. 277, 99 L.Ed. 279 (1955) (theater); *United States v. International Boxing Club,* 348 U.S. 236, 75 S.Ct. 259, 99 L.Ed. 290 (1955) (boxing); *Radovich v. National Football League,* 352 U.S. 445, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957) (football). In each of these cases, however, the Court declined the invitation. Moreover, to head off any further attempted extensions of those decisions, the Court stated in *Radovich* with crystal clarity that "we now specifically limit the rule ... established [in *Federal Baseball* and *Toolson* ] to the facts there involved, *i.e.,* the business of organized professional baseball." *Radovich,* 352 U.S. at 451, 77 S.Ct. at 394.

The next and most recent time the Supreme Court directly considered the exemption was in *Flood v. Kuhn,* 407 U.S. 258, 92 S.Ct. 2099, 32 L.Ed.2d 728 (1972). Like *Toolson,* the plaintiff in *Flood* was a professional baseball player dissatisfied with the reserve clause in his contract and the "reserve system" generally.[19] After an extensive analysis of the history of the exemption, Justice Blackmun, who delivered the opinion of the Court, produced a list of statements that can be made regarding the exemption and its circumstances:

1. Professional baseball is a business and it is engaged in interstate commerce.

2. With its reserve system enjoying exemption from the federal antitrust laws, baseball is, in a very distinct sense, an exception and an anomaly. *Federal Baseball* and *Toolson* have become an aberration confined to baseball.

3. Even though others might regard this as "unrealistic, inconsistent, or illogical," the aberration is an established one ..., heretofore deemed fully entitled to the benefit of *stare decisis,* and one that has survived the Court's expanding concept of interstate commerce....

4. Other professional sports operating interstate—football, boxing, basketball, and, presumably, hockey and golf—are not so exempt.

5. The Court has emphasized that since 1922 baseball, with full and continuing congressional awareness, has been allowed to develop and to expand unhindered by federal legislative action.... The Court accordingly has concluded that Congress as yet has had no intention to subject baseball's reserve system to the reach of the antitrust statutes....

*Id.* at 282–84, 92 S.Ct. at 2111–13 (footnotes and citations omitted).

### b. *Discussion*

#### (i) *Scope of the exemption*

In each of the three cases in which the Supreme Court directly addressed the exemption, the factual context involved the reserve clause. Plaintiffs argue that the exemption is confined to that circumstance, which is not presented here. Baseball, on the other hand, argues that the exemption applies to the "business of baseball" generally, not to one particular facet of the game.

Between 1922 and 1972, Baseball's expansive view may have been correct. Although *Federal Baseball* involved the reserve clause, that decision was based upon the proposition that the business of exhibiting baseball games, as opposed to the business of moving

---

19. The "reserve system" includes the reserve clause and Major League Baseball rules designed to complement the clause in confining the player

to the club that has him under contract and otherwise providing contract uniformity. *See Flood,* 407 U.S. at 259 n. 1, 92 S.Ct. at 2100 n. 1.

players and their equipment, was not interstate commerce and thus not subject to the Sherman Act. *Toolson*, also a reserve clause case, spoke in terms of the "business of baseball" enjoying the exemption. *Toolson*, 346 U.S. at 357, 74 S.Ct. at 78–79. Likewise, *Radovich*, a 1957 decision concerning football, recognized the exemption as extending to the "business of organized professional baseball." *Radovich*, 352 U.S. at 450–53, 77 S.Ct. at 393–95.

In 1972, however, the Court in *Flood v. Kuhn* stripped from *Federal Baseball* and *Toolson* any precedential value those cases may have had beyond the particular facts there involved, *i.e.*, the reserve clause. The *Flood* Court employed a two-prong approach in doing so. First, the Court examined the analytical underpinnings of *Federal Baseball*—that the business of exhibiting baseball games is not interstate commerce. In the clearest possible terms, the Court rejected this reasoning, removing any doubt that "[p]rofessional baseball is a business ... engaged in interstate commerce." *Flood*, 407 U.S. at 282, 92 S.Ct. at 2112.

Having entirely undercut the precedential value of the *reasoning* of *Federal Baseball*, the Court next set out to justify the continued precedential value of the *result* of that decision. To do this, the Court first looked back to *Toolson* and uncovered the following four reasons why the Court there had followed *Federal Baseball*:

(a) Congressional awareness for three decades of the Court's ruling in *Federal Baseball*, coupled with congressional inaction. (b) *The fact that baseball was left alone to develop for that period upon the understanding that the reserve system was not subject to existing antitrust laws.* (c) A reluctance to overrule *Federal Baseball* with consequent retroactive effect. (d) A professed desire that any needed remedy be provided by legislation rather than court decree.

*Id.* at 273–74, 92 S.Ct. at 2108 (emphasis added). The emphasized text indicates that the *Flood* Court viewed the *disposition* in *Federal Baseball* and *Toolson* as being limited to the reserve system, for baseball developed between 1922 and 1953 with the understanding that its *reserve system*, not the game generally, was exempt from the antitrust laws. This reading of *Flood* is buttressed by (1) the reaffirmation in *Flood* of a prior statement of the Court that " '*Toolson* was a narrow application of the doctrine of *stare decisis*,' " *id.* at 276, 92 S.Ct. at 2109 (quoting *Shubert*, 348 U.S. at 228–30, 75 S.Ct. at 281–82); and (2) the *Flood* Court's own characterization, in the *first sentence* of its opinion, of the *Federal Baseball*, *Toolson*, and *Flood* decisions: "For the third time in 50 years the Court is asked *specifically* to rule that professional baseball's *reserve system* is within the reach of the antitrust laws." *Id.* at 259, 92 S.Ct. at 2100 (emphasis added) (footnote omitted).

Viewing the dispositions in *Federal Baseball* and *Toolson* as limited to the reserve clause, the *Flood* Court then turned to the reasons why, even though analytically vitiated, the precise results in *Federal Baseball* and *Toolson* were to be accorded the continuing benefit of *stare decisis*. Like *Toolson*, the *Flood* Court laid its emphasis on continued positive congressional inaction and concerns over retroactivity. *Id.* at 283–84, 92 S.Ct. at 2112–13. In particular, the *Flood* Court "concluded that Congress as yet has had no intention to subject baseball's *reserve system* to the reach of the antitrust statutes." *Id.* at 283, 92 S.Ct. at 2112 (emphasis added). Finally, the Court acknowledged that "[w]ith its *reserve system* enjoying exemption from the federal antitrust laws, baseball is, in a very distinct sense, an exception and an anomaly. *Federal Baseball* and *Toolson* have become an aberration confined to baseball." *Id.* at 282, 92 S.Ct. at 2112 (emphasis added). Thus in 1972, the Supreme Court made clear that the *Federal Baseball* exemption is limited to the reserve clause.

Relying primarily upon *Charles O. Finley & Co. v. Kuhn*, 569 F.2d 527 (7th Cir.1978), *cert. denied*, 439 U.S. 876, 99 S.Ct. 214, 58 L.Ed.2d 190 (1978), defendant Baseball offers a different reading of *Flood*. The plaintiff in that case, Charles O. Finley & Co. ("Finley"), owned the Oakland Athletics ("Oakland") baseball club. *Finley*, 569 F.2d at 530. In June of 1976, Oakland negotiated tentative agreements to sell Oakland's contract rights

in three players to other teams. *Id.* at 531. Defendant Commissioner of Baseball Bowie Kuhn disapproved of the sale, and Finley subsequently brought suit, claiming, among other things, that the Commissioner conspired with others in violation of the antitrust laws. *Id.* Finding the Commissioner exempt from the antitrust laws under *Federal Baseball,* the district court granted summary judgment in favor of the Commissioner, and Finley appealed.

Like plaintiffs here, Finley argued on appeal that the exemption applies only to the reserve system. The Seventh Circuit disagreed, finding that "[d]espite the *two* references in the *Flood* case to the reserve system, it appears clear from the entire opinions in the three baseball cases, as well as from *Radovich,* that the Supreme Court intended to exempt the business of baseball, not any particular facet of that business, from the federal antitrust laws." *Id.* at 541 (emphasis added) (footnotes omitted).

In reaching this conclusion, the Seventh Circuit looked back to *Federal Baseball, Toolson,* and *Radovich,* as I have done here, and concluded that the Court had focused in those cases upon the business of baseball, not just the reserve clause. Then the court discussed *Flood:*

> In *Flood v. Kuhn,* the Court said that "Professional baseball is engaged in interstate commerce" and "we adhere once again to *Federal Baseball* and *Toolson* and to their application to professional baseball."

*Id.* (citation omitted). This single paragraph represents the Seventh Circuit's entire substantive discussion of *Flood*—the Supreme Court's most recent and most thorough explanation of the *Federal Baseball* exemption. The court discounted two references in *Flood* to the reserve clause [20] and made no mention of the fact that *Flood* refers to the reserve clause at least *four* times, the two not dis-

cussed by the court indicating that (1) the Supreme Court reads *Federal Baseball* and *Toolson* as reserve clause cases, *Flood,* 407 U.S. at 273–74, 92 S.Ct. at 2107–08; and (2) the Court continues to follow the precise disposition of those decisions because Congress continues to express no intention of subjecting the reserve clause to the antitrust laws, *id.* at 283, 92 S.Ct. at 2112.

But there is an even more significant flaw in the Seventh Circuit's analysis of *Flood* than in failing to note the extent to which that decision turned upon the reserve clause: Application of the doctrine of *stare decisis* simply permits no other way to read *Flood* than as confining the precedential value of *Federal Baseball* and *Toolson* to the precise facts there involved. To understand why this is so, one must fully understand the doctrine of *stare decisis* and its application by lower courts to Supreme Court decisions. The Third Circuit recently offered the following explanation:

> [Supreme Court] ... opinions usually include two major aspects. First, the Court provides the legal standard or test that is applicable to laws implicating a particular ... provision. This is part of the reasoning of the decision, the *ratio decidendi.* Second, the Court applies that standard or test to the particular facts of the case that the Court is confronting—in other words, it reaches a specific result using the standard or test.
>
> As a lower court, we are bound by both the Supreme Court's choice of legal standard or test and by the result it reaches under the standard or test. As Justice Kennedy has stated, courts are bound to adhere not only to results of cases, but also "to their explications of the governing rules of law." Our system of precedent or *stare decisis* is thus based on adherence to both the reasoning and result of a case, and not simply to the result alone. This

---

**20.** The *Finley* court identified the following two references to the reserve clause in *Flood:*

> For the third time in 50 years the Court is asked specifically to rule that professional baseball's reserve system is within the reach of the federal antitrust laws.

*Finley,* 569 F.2d at 540 n. 48 (quoting *Flood,* 407 U.S. at 259, 92 S.Ct. at 2100).

> With its reserve system enjoying exemption from the federal antitrust laws, baseball is, in a very distinct sense, an exception and an anomaly.

*Id.* (quoting *Flood,* 407 U.S. at 282, 92 S.Ct. at 2112).

distinguishes the American system of precedent, sometimes called "rule stare decisis," from the English system, which historically has been limited to following the results or disposition based on the facts of a case and thus referred to as "result stare decisis."

Like lower courts, the Supreme Court applies principles of *stare decisis* and recognizes an obligation to respect both the standard announced and the result reached in its prior cases. Unlike lower courts, the Supreme Court is free to change the standard or result from one of its earlier cases when it finds it to be "unsound in principle [or] unworkable in practice."

*Planned Parenthood of Southeastern Pa. v. Casey*, 947 F.2d 682, 691–92 (3d Cir.1991) (citations omitted), *aff'd in part and rev'd in part on other grounds*, —— U.S. ——, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992).

Applying these principles of *stare decisis* here, it becomes clear that, before *Flood*, lower courts were bound by both the *rule* of *Federal Baseball* and *Toolson* (that the business of baseball is not interstate commerce and thus not within the Sherman Act) [21] and the *result* of those decisions (that baseball's reserve system is exempt from the antitrust laws). The Court's decision in *Flood*, however, effectively created the circumstance referred to by the Third Circuit as "result stare decisis," from the English system. In *Flood*, the Supreme Court exercised its discretion to invalidate the *rule* of *Federal Baseball* and *Toolson*. Thus no rule from those cases binds the lower courts as a matter of *stare decisis*. The only aspect of *Federal Baseball* and *Toolson* that remains to be followed is the result or disposition based upon the facts there involved, which the Court in *Flood* determined to be the

exemption of the reserve system from the antitrust laws.

◼ Neither *Finley* nor any other case cited by Baseball in support of its view of the exemption has undertaken such an analysis of the Supreme Court's baseball trilogy.[22] And as none of these decisions is binding upon this Court, I will not follow them.[23] It is well settled that exemptions from the antitrust laws are to be narrowly construed. *See Group Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 231, 99 S.Ct. 1067, 1083, 59 L.Ed.2d 261 (1979). Application of this principle is particularly appropriate, if not absolutely critical, in this case because the exemption at issue has been characterized by its own creator as an "anomaly" and an "aberration." *Flood*, 407 U.S. at 282, 92 S.Ct. at 2111–12; *see also id.* at 286, 92 S.Ct. at 2114 (*Federal Baseball* is a "derelict in the stream of the law." (Douglas, J. dissenting)). For these reasons, I conclude that the antitrust exemption created by *Federal Baseball* is limited to baseball's reserve system, and because the parties agree that the reserve system is not at issue in this case, I reject Baseball's argument that it is exempt from antitrust liability in this case.

### (ii) *Nature of the exemption*

◼ Although it would be appropriate to end here my discussion of the *Federal Baseball* exemption, for the purpose of providing a complete record of decision in the event of certification for immediate appeal under 28 U.S.C.A. § 1292(b) (West Supp.1993), I will press on to consider the implications of applying "rule stare decisis" to *Federal Baseball* and plaintiffs' complaint.

---

21. *Radovich* later made clear that this rule applied only to the business of organized baseball, prohibiting its application to other professional sports. *See Radovich*, 352 U.S. at 450, 77 S.Ct. at 393.

22. Baseball cites the following decisions, among others, in support of its view: *Professional Baseball Schools & Clubs, Inc. v. Kuhn*, 693 F.2d 1085 (11th Cir.1982); *Triple–A Baseball Club Associates v. Northeastern Baseball, Inc.*, 832 F.2d 214 (1st Cir.1987), *cert. denied*, 485 U.S. 935, 108

S.Ct. 1111, 99 L.Ed.2d 272 (1988); *Portland Baseball Club, Inc. v. Kuhn*, 491 F.2d 1101 (9th Cir.1974); *Salerno v. American League of Professional Baseball Clubs*, 429 F.2d 1003 (2d Cir. 1970), *cert. denied*, 400 U.S. 1001, 91 S.Ct. 462, 27 L.Ed.2d 452 (1971).

23. I note that the Third Circuit has neither analyzed *Flood* nor construed the contours of the *Federal Baseball* exemption. I am bound, however, to follow the approach to *stare decisis* set forth by the Third Circuit in *Planned Parenthood*.

Assuming, as Baseball would have it, that *Finley* is correct and the exemption extends beyond the reserve system, I must determine exactly how far the exemption reaches. I find that stating, as did the *Finley* court, that the exemption covers the "business of baseball" does little to delineate the contours of the exemption.

As mentioned above, to state a claim under the Sherman Act, plaintiffs must allege injury to competition in a relevant product market. *See Mid–South Grizzlies*, 720 F.2d at 785. Although the Supreme Court has not couched its explanation of the exemption in these terms, I believe that the only arguably surviving rule to be gleaned from the Court's baseball trilogy is that if the relevant product market involved is the market defined as the "business of baseball," injury to competition in that market may not be redressed under the Sherman Act.[24] *Cf. Henderson Broadcasting Corp. v. Houston Sports Ass'n*, 541 F.Supp. 263 (S.D.Tx.1982) (exemption does not apply to market for broadcast of baseball games). *Federal Baseball* itself made this clear. The focus in that case was upon competition in two different businesses or markets. The first was defined as the business of "giving exhibitions of base ball [sic]." *Federal Baseball*, 259 U.S. at 208, 42 S.Ct. at 466. The second was defined as the business of "moving players and their paraphernalia from place to place." *D.C. Opinion*, 269 F. at 686. The Sherman Act was held not to apply to restraints in the first market because that market did not implicate interstate commerce. *Federal Baseball*, 259 U.S. at 208–09, 42 S.Ct. at 465–66. Restraints in the second market, however, were redressable under the Sherman Act because that market did implicate interstate commerce. *D.C. Opinion*, 269 F. at 687–88. Thus, assuming the validity of *Finley*, the *Federal Baseball* exemption is one related to a particular market—the market comprised of the exhibition of baseball games—not a particu-

lar type of restraint (such as the reserve clause) or a particular entity (such as Major League Baseball).

It follows from having expressed the exemption as relating to a particular market that the next question is whether the plaintiffs in this case seek relief for restraints in that market or some other market. If Baseball's allegedly unlawful conduct merely restrained competition in the market comprised of baseball exhibitions, Baseball is immune from liability under the Act. If some other market was involved, however, even the expansive version of the *Federal Baseball* exemption would not apply.

A "market" may be defined as "any grouping of sales whose sellers, if unified by a hypothetical cartel or merger, could raise prices significantly above the competitive level." Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 518.1b (Supp.1991) (footnote omitted). As stated above, plaintiffs allege that the relevant product market in this case is the market for ownership of existing major league professional baseball teams. Reduced to its essentials, one can infer at this stage of the proceedings that this market has the following components: (1) the product being sold is an ownership interest in professional baseball teams; (2) the sellers are team owners; and (3) the buyers are those who would like to become team owners. Viewing the complaint in the light most favorable to plaintiffs, it would not be unreasonable also to infer that if the team owners combined, they could increase the price of teams considerably and control the conditions of sale.[25]

The market to which the expansive version of the *Federal Baseball* exemption applies, on the other hand, has the following components: (1) the product is the exhibition of baseball games; (2) the sellers, as with the market defined by plaintiffs, are team owners; and (3) the buyers are fans and, per-

---

**24.** In light of *Flood*, I do not believe, nor do I understand Baseball to argue, that *Federal Baseball*'s interstate commerce reasoning remains vital.

**25.** One might also view the relevant market more narrowly as the market for the purchase and transfer of the Giants only, where there was but

one seller, Robert Lurie, constituting a monopoly, with the buyer group including only those interested in the Giants, as opposed to other professional baseball teams. On a motion to dismiss, I must view the relevant market in the manner most favorable to plaintiffs.

haps, the broadcast industry. Thus the two markets have different products—baseball teams versus baseball games—and different consumers.

Although not expressed in market terms, the Court of Appeals in *Federal Baseball* attributed great weight to such differences. The court distinguished for Sherman Act purposes between the business that encompassed the exhibition of baseball games (the "game exhibition market") and the business that involved the movement of players and their paraphernalia (the "player transportation market"). *D.C. Opinion*, 269 F. at 686. The focus of the exemption was on the exhibition of games only, which Justice Holmes characterized in affirming the Court of Appeals as "purely state affairs." *Federal Baseball*, 259 U.S. at 208, 42 S.Ct. at 466. Other aspects of a baseball team's business—interstate aspects distinguishable from but nonetheless related to the games such as the movement of players and equipment—were not part of the exemption. Thus the anticompetitive nature of the reserve clause in the game exhibition market was found not to violate the Sherman Act, but could have given rise to a claim under the Act had it directly affected other markets. A similar distinction may be made here. The plaintiffs in this case target not anticompetitive activity in the market for the exhibition of baseball *games;* but anticompetitive activity in market for the sale of ownership interests in baseball *teams*—a market seemingly as distinguishable from the game exhibition market as the player transportation market.

Recent courts construing the expansive version of the exemption, although not focusing upon the distinction made by the Court of Appeals in *Federal Baseball*, have defined the exempted market (characterized as the "business of baseball") as that which is central to the " 'unique characteristics and needs' " of baseball. *Postema v. National League of Professional Baseball Clubs*, 799

F.Supp. 1475, 1488 (S.D.N.Y.1992) (quoting *Flood*, 407 U.S. at 282, 92 S.Ct. at 2112), *rev'd on other grounds*, 998 F.2d 60 (2d Cir.1993); [26] *Henderson*, 541 F.Supp. at 268–69, 271 (*Federal Baseball* exemption not applicable to market for broadcast of baseball games). There seems to be agreement among these courts and others that, defined in this way, the exempted market includes (1) the reserve system and (2) matters of league structure. *See, e.g., Professional Baseball Schools and Clubs, Inc. v. Kuhn*, 693 F.2d 1085 (11th Cir.1982); *Postema*, 799 F.Supp. at 1489; *Henderson*, 541 F.Supp. at 269; *State v. Milwaukee Braves, Inc.*, 31 Wis.2d 699, 144 N.W.2d 1, 15 (1966), *cert. denied*, 385 U.S. 990, 87 S.Ct. 598, 17 L.Ed.2d 451 (1966).

I do not view these decisions as conflicting with the analysis of the Court of Appeals in *Federal Baseball*. Applying their logic, the Court of Appeals can be understood as essentially viewing the movement of players and their equipment from game to game as a market activity not central to the unique characteristics and needs of exhibiting baseball games. Thus, when these decisions are considered together, the following list of activities or markets that are *not* within the exempted market can be generated: (1) the movement of players and their equipment from game to game; (2) the broadcast of baseball games; and, perhaps, (3) employment relations between organized professional baseball and non-players.

No court, however, has analyzed or applied the expansive view of the *Federal Baseball* exemption to the market for ownership interests in existing baseball teams. Thus I must determine whether this market is central to the unique characteristics and needs of baseball exhibitions. I conclude that such a determination is not possible without a factual record, and that, viewing plaintiffs' complaint in their favor, plaintiffs may be able to dem-

---

**26.** *Postema* held that the *Federal Baseball* exemption does not apply to baseball's employment relationships with non-players such as umpires because such relationships "are not a unique characteristic or need of the game." *Id.* at 1489. *But see Salerno v. American League of Professional Baseball Clubs*, 429 F.2d 1003 (2d Cir.1970)

(holding that employment relations with umpires are within the exemption), *cert. denied*, 400 U.S. 1001, 91 S.Ct. 462, 27 L.Ed.2d 452 (1971). *Postema* chose not to follow *Salerno* because it was decided before *"Flood's* apparent endorsement of a limited view of the exemption." *Postema*, 799 F.Supp. at 1475.

onstrate that team ownership is not central to baseball's unique characteristics.

Plaintiffs plead that they were attempting to acquire an interest in a business owned by Robert Lurie engaged in the exhibition of baseball games—the San Francisco Giants. As stated above, the products being sold in this market (teams) are different from those being sold in the exempted market (games). And acquiring an ownership interest in a team may very well be no more unique to the exhibition of baseball games than is moving players and their equipment from game to game. Although players and their equipment are, beyond doubt, uniquely necessary to a baseball game, the Court of Appeals in *Federal Baseball* found, on a trial record, that their movement—which essentially involves the transportation of men and equipment—was not. Likewise, although teams, as business entities engaged in exhibiting baseball games, are undoubtedly a unique necessity to the game, the transfer of ownership interests in such entities may not be so unique. Moreover, anticompetitive conduct toward those who seek to purchase existing teams has never been considered by any court to be an essential part of the exhibition of baseball games.

On the other hand, it is conceivable that, although the precise products in plaintiffs' market and the exempted market are different, these markets nonetheless overlap to such an extent that they should be treated identically for purposes of the expansive view of *Federal Baseball*. In other words, the acquisition of a business that is engaged in baseball exhibitions may be central in some way not apparent on the face of the complaint to the unique characteristics of baseball exhibitions. Without a factual record, I would be engaged in mere speculation in deciding now whether it is or is not.

Accordingly, I conclude that if "rule stare decisis" and the *Finley* expansive view were applied, this case would not be ripe for determination of whether the *Federal Baseball* exemption applies. Thus, even under this analysis, Baseball's motion would be denied. One additional observation bears mentioning. I have considered plaintiffs' complaint in the light most favorable to plaintiffs and have accepted their definition of the relevant market as the market for team *ownership*. But the gravamen of plaintiffs' case may be Baseball's interference with plaintiffs' efforts to acquire and *relocate* the Giants to Florida. As stated earlier, matters of league structure have been viewed by other courts as being unique to baseball. The physical relocation of a team and Baseball's decisions regarding such a relocation could implicate matters of league structure, and thus be covered by the exemption. If, therefore, the expansive view of *Federal Baseball* were applied and a factual record were developed showing that this case concerns only restraints on the market for ownership *and* relocation of the Giants as inseparable activities, "rule stare decisis" could require application of the exemption.

### III. CONCLUSION

Baseball's motion to dismiss is granted in part and denied in part. Plaintiffs' direct claims under the U.S. Constitution are dismissed. In all other respects the motion is denied. Because I have not dismissed all of plaintiffs' claims over which this Court has original jurisdiction, I will continue to exercise supplemental jurisdiction over plaintiffs' state law claims. *See* 28 U.S.C.A. § 1367 (West Supp.1993).

An appropriate order follows.

### ORDER

AND NOW, this 4th day of August, 1993, upon consideration of Defendants' Motion to Dismiss the Complaint (Docket Entry No. 3) and all papers filed in support thereof and in response thereto, and after oral argument, IT IS HEREBY ORDERED that said motion is GRANTED IN PART AND DENIED IN PART for the reasons stated in the accompanying Opinion, as follows:

1. Plaintiffs' direct claims under the U.S. Constitution (Count I) are DISMISSED:

2. In all other respects, defendants' motion is DENIED.