**HENDERSON BROADCASTING CORP., more commonly known as KYST–AM, Plaintiff,**

**v.**

**HOUSTON SPORTS ASSOCIATION, INC., and Lake Huron Broadcasting Corp., owner of KENR–AM Radio, Defendants.**

Civ. A. No. H–81–558.

United States District Court, S. D. Texas, Houston Division.

May 20, 1982.

Charles J. Brink, M. H. Cersonsky, Charles J. Brink & Assoc., Houston, Tex., for plaintiff.

William Key Wilde, Houston, Tex., for defendants.

## MEMORANDUM OPINION AND ORDER

### McDONALD, District Judge.

Henderson Broadcasting Corporation, radio station KYST–AM (KYST), has sued Houston Sports Association (HSA), the owner of the Houston Astros baseball team, and Lake Huron Broadcasting Corporation, owner of KENR–AM radio (KENR), charging: violations of the Sherman Act, 15 U.S.C. §§ 1 and 2 and of the Texas Antitrust laws; breach of contract; inducing the repudiation of a contract, and interference with business relationships. Plaintiff seeks injunctive relief and over two and a half million dollars in damages. Federal jurisdiction is premised solely on the Clayton Act violations under 15 U.S.C. §§ 15 and 26. Defendants have moved to dismiss for lack of subject matter jurisdiction and failure to state a claim on the grounds that defendants' actions fall within the baseball exemption from the antitrust laws.

The gist of the complaint is that HSA cancelled KYST's contract to broadcast Astro baseball games. Plaintiff alleges that HSA as "the network" entered into station contracts with both plaintiff and defendant KENR[1]; that plaintiff KYST and defendant KENR have overlapping broadcast signals and compete for listeners and advertising revenue; and that defendant HSA breached its contract with plaintiff in a conspiracy with KENR to divide and allocate advertising and audience territories in the greater Houston-Galveston radio broadcasting market, to eliminate competition for advertising revenue and listening audiences, and thus to impose horizontal restraints on that radio market area.[2]

On August 28, 1981 this Court entered an Order deferring a ruling on defendants' Motions to Dismiss in order to allow the parties to present oral argument on the question of the applicability of the baseball exemption from the antitrust laws to this case. Having heard oral argument on the issue, the Court DENIES defendants' Motions to Dismiss. For the reasons stated below, the Court finds that it has subject matter jurisdiction and therefore rules on defendants' Motion to Dismiss for failure to state a claim, Rule 12(b)(6), Federal Rules of Civil Procedure. Defendants have not articulated a particular ground for that motion. To the extent it rests on the baseball exemption, it is denied on the same grounds as the 12(b)(1) motion. To the extent it challenges interstate aspect of defendants' business, plaintiff's allegation that radio and television are a significant part of defendant HSA's business satisfies the inter-

1. The contract between plaintiff and defendant HSA, incorporated into the complaint as an exhibit, required that "the network," HSA, designate advertisers, determine the format of the program by which baseball games were broadcast and, with certain exceptions, furnish and control the placement and manner of presentation of all sponsors' commercial material.

2. Part III of plaintiff's Complaint outlines the "nature of trade and commerce" involved: The sale of advertising time to businesses at the local, regional and national levels is the primary source of income for radio stations. A station's ability to attract advertisers depends on the size of its broadcast area and the number of its listeners, as well as the variety of its programming, the quality of advertising presentations and its prices. The advertising rates a station can charge and the number of potential advertisers depend largely on the size of the listening audience as measured by "ratings." The effect of defendant HSA's cancellation of its contract with plaintiff KYST was a loss of listeners, and therefore of advertisers and revenue to KYST.

state commerce requirements of the antitrust laws. *Radovich v. National Football League*, 352 U.S. 445, 453, 77 S.Ct. 390, 394, 1 L.Ed.2d 456 (1957). Defendants have not shown that plaintiff can prove no set of facts in support of its claims. *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

■ In moving to dismiss plaintiff's claim for lack of subject matter jurisdiction on the ground of the baseball exemption from the antitrust laws, defendant makes a facial rather than a factual attack on this Court's jurisdiction, and the Court is required to accept as true plaintiff's allegations that defendants' actions in terminating HSA's contract with plaintiff are in violation of the antitrust laws.[3] There is moreover, a presumption against exemptions to the antitrust laws so that defendants have the burden of proving that their actions are exempt or immune from the laws.[4]

■ The Court holds that defendants' alleged actions are not exempt from the antitrust laws. This decision rests on three considerations. First, the United States Supreme Court has implied that broadcasting is not central enough to baseball to be encompassed in the baseball exemption.

Second, Congressional action does not support an extension of the exemption to radio broadcasting. Third, lower federal courts have declined to apply the baseball exemption in suits involving business enterprises which, like broadcasting, are related to but separate and distinct from baseball.

### I. The Supreme Court's Baseball Exemption

The United States Supreme Court has held in three decisions that baseball is exempt from the antitrust laws. It has not considered the precise question of whether radio broadcasting of baseball games is also exempt, but its opinions imply that the exemption covers only those aspects of baseball, such as leagues, clubs and players which are integral to the sport and not related activities which merely enhance its commercial success.

Justice Holmes created the baseball exemption in *Federal Base Ball Club of Baltimore, Inc. v. National League of Professional Baseball Clubs, et al.*, 259 U.S. 200, 208–209, 42 S.Ct. 465, 466, 66 L.Ed. 898 (1922). There, plaintiff club refused to sign an agreement between the two major leagues, and found itself without clubs to play. It charged defendant leagues with

---

**3.** *Evans v. Tubbe*, 657 F.2d 661, (5th Cir. 1981); *Williamson v. Tucker*, 645 F.2d 404, 412–413 (5th Cir. 1981); *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511, (5th Cir. 1980), *cert. denied*, 449 U.S. 953, 101 S.Ct. 358, 66 L.Ed.2d 217. This case, like *McLain v. Real Estate Board of New Orleans, Inc.*, 583 F.2d 1315 (5th Cir. 1978), is not one in which the question on jurisdiction and the merits are inextricably bound and therefore the Court need not defer ruling to the trial on the merits.

**4.** Where there is, for example, a question of statutory construction arising from a conflict between federal antitrust laws and a regulatory scheme, the court, to imply an exemption, must find that it is "necessary in order to make the regulatory Act work, 'and even then the court will imply the exemption only to the minimum extent necessary.'" *Cantor v. Detroit Edison Co.*, 428 U.S. 579, 597, 96 S.Ct. 3110, 3121, 49 L.Ed.2d 1141 (1976), quoting *Silver v. New York Stock Exchange*, 373 U.S. 341, 357, 83 S.Ct. 1246, 1257, 10 L.Ed.2d 389 (1963).

We have long recognized that the antitrust laws represent a fundamental national economic policy and have therefore concluded that we cannot lightly assume that the enactment of a special regulatory scheme for particular aspects of an industry was intended to render the more general provisions of the antitrust laws wholly inapplicable to that industry.

*Carnation Company v. Pacific Westbound Conference et al.*, 383 U.S. 213, 218, 86 S.Ct. 781, 784, 15 L.Ed.2d 709 (1965).

Similarly, in the case of judicially-created exemptions, "We do not start with a clean slate, neatly balancing whether there should or should not be antitrust jurisdiction .... The burden is on defendants to demonstrate that they or their practices were intended to be exempt or immune from the broad mandate of the Act." *United States v. American Telephone and Telegraph Company, et al.*, 461 F.Supp. 1314, 1324 (D.D.C.1978) (exemption for regulated industries). *See also Allegheny Uniforms v. Howard Uniform Company, et al.*, 384 F.Supp. 460, 463 (W.D.Pa.1974) (*Parker v. Brown* exemption/defense for government action).

conspiring to monopolize the baseball business, a new enterprise at that time, by means of the league organization and reserve system which required players to contract with their clubs for one year and "for a succeeding season . . . ." Holmes, writing for a unanimous court, held baseball exempt from the antitrust laws. He reasoned:

> The business is giving exhibitions of base ball, which are purely state affairs. It is true that in order to attain for these exhibitions the great popularity that they have achieved, competition must be arranged between clubs from different cities and states. But the fact that in order to give the exhibitions the league must induce free persons to cross state lines and must arrange and pay for their doing so is not enough to change the character of the business . . . [T]he transport is a mere incident, not the essential thing. That to which it is incident, the exhibition, although made for money would not be called trade or commerce in the commonly accepted use of those words . . .

*Id.,* (citations omitted).

In the second case to reach the Supreme Court, *Toolson v. New York Yankees,* 346 U.S. 356, 74 S.Ct. 78, 98 L.Ed. 64 (1953), the Court adhered to its holding in *Federal Base Ball* despite the clear impact of interstate radio and television broadcasting on baseball. Professional baseball players sued the owners of professional baseball clubs and the commissioner of baseball for antitrust violations on the ground that the reserve clauses of organized baseball's player contracts and the nationwide agreements among several clubs in the various leagues created a monopoly which deprived players of services and the opportunity for advancement. As the dissenting opinion noted, a Congressional Subcommittee, in H.R.Rep. No.2002, 82d Congress, 2d Session 4, 5, (1952), had reported that the primary sources of revenue to baseball in 1950 were admissions, radio and television and concessions, and that the fastest growing source of revenue for major league clubs was radio and television. Nevertheless, the majority wrote its *per curiam* opinion expressly "[w]ithout reexamination of the underlying issues." It read *Federal Base Ball* as holding that "the business of providing public baseball games for profit between clubs or professional baseball players was not within the scope of the federal antitrust laws," and concluded from congressional inaction in the thirty years following that decision, that Congress "had no intention of including the business of baseball within the scope of the federal antitrust laws," and "that if there are evils in this field which now warrant application to it of the antitrust laws it should be by legislation." *Id.,* at 357, 74 S.Ct. at 78.

The third and last consideration of the baseball exemption by the Supreme Court was in 1970. Curtis Flood, a center fielder for the St. Louis Cardinals, sued the Commissioner of Baseball, the presidents of the two major leagues and the twenty-four major league clubs for antitrust violations when he was traded without his consultation as part of a multi-player transaction. The district court dismissed the complaint, and the Court of Appeals affirmed. The Supreme Court held for the first time, in direct contradiction to the original premise for the exemption in *Federal Baseball,* that "professional baseball is a business and it is engaged in interstate commerce," and that "baseball is in a very distinct sense an exception and an anomaly . . . an aberration," *Flood v. Kuhn,* 407 U.S. 258, 283, 92 S.Ct. 2099, 2112, 32 L.Ed.2d 728 (1972).

It stated that "[t]he advent of radio and television with their consequent increased coverage and additional revenues has not occasioned an overruling of *Federal Baseball* and *Toolson*" and concluded again that "Congress as yet has no intention to subject baseball's reserve system to the reach of the antitrust laws." *Id.,* at 283, 92 S.Ct. at 2112. The major part of the opinion consists of a history of the federal courts' decisions on the baseball exemption. The court noted its past expressions of "concern about the confusion and the retroactivity problems that inevitably would result with a judicial overturning of *Federal Baseball.*"

Its focus was, as it had been in *Toolson*, not on the substance and the merits of the baseball exemption but on *stare decisis*, and the danger of judicial legislation.

The *stare decisis* basis for both the *Toolson* and *Kuhn* decisions and thus the narrow scope of the baseball exemption is reflected in the court's failure to make reference to an important decision by the Court of Appeals for the Second Circuit, several years before *Toolson*, which confronted the impact of the media on the baseball exemption. In *Gardella v. Chandler*, 172 F.2d 402 (2d Cir. 1949) plaintiff was barred from playing with the organized baseball clubs after he violated the terms of the reserve clause of his contract and sued the commissioner of baseball and the National and American Leagues' presidents for anti-trust violations. Judges Frank and Hand, forming the majority of a three judge panel, reversed and remanded the district court's dismissal for lack of jurisdiction on the basis of the baseball exemption. Although broadcasting itself was not at issue, Judge Frank wrote that defendant's lucrative contracts for interstate communication distinguished the case from *Federal Base Ball* since, "the interstate communication by radio and television is in no way a means, incidental or otherwise, of performing the intra-state activities (the local playings of the games) ... [H]ere the games themselves because of radio and television, are so to speak, played interstate as well as intrastate ...." *Id.*, at 411–412, and thus the court should view a monopoly in baseball as it would one "related to the production of stage-plays in radio and television studios." *Id.* at 414.

Judge Hand took the analysis a step further. To him "the only debatable question [wa]s whether the defendants' connection with these activities [radio and television broadcasting] makes them a part of their business and enough a part of it to color the whole." He found that "[t]he contracts with the [radio and television broadcasting] companies are mutual arrangements in which each contributes a share to a common venture," and that these arrangements are not

merely incidents of the business, as were the interstate features in *Federal Base Ball Club v. National League* ... On the contrary, they are part of the business itself, for that consists in giving public entertainment. The players are the actors, the radio listeners and the television spectators are the audiences; together they form as indivisible a unit as do actors and spectators in the theatre.

*Id.*, at 407–408. Concluding, that defendants were "*pro tanto* engaged in interstate commerce," he posed the question to the district court whether "these features of the business no matter now insignificant they may prove, necessarily subjected it as a whole to the antitrust laws," and stated that for the plaintiff to prevail

he must show that the defendant's conduct, by which he was injured, was itself subject to the law that he invokes ... not ... that he was injured by the broadcasting and television; but that ... those activities together with any other interstate activities marked the business as a whole. Certainly that was implied in *Federal Baseball* ... itself ... [where] nobody questioned that many interstate activities were in fact involved in professional baseball; the court merely thought them not important enough to fix the business-at-large with an interstate character.

*Id.* at 408. The question of the effect of broadcasting on the baseball exemption was left unresolved because *Gardella* was settled without further proceedings.

Additional evidence of the narrow scope of the Supreme Court's judicially-created baseball exemption is the court's consistent refusal to extend the exemption to other professional sports, in part because of the interstate broadcasting of the sports. In *United States v. International Boxing*, 348 U.S. 236, 243, 75 S.Ct. 259, 262, 99 L.Ed. 290 (1955) the Court found that the "controlling consideration [in *Federal Base Ball*] was a very practical one—the degree of interstate activity involved in the particular business under review," and held that such activity

in boxing subjected it to the antitrust laws. The appendix to the opinion, included as part of the complaint's description of the "Nature of Trade and Commerce Involved" the statement that the "promotion of professional championship boxing contests . . . includes . . . selling tickets and rights to make motion pictures . . . and selling rights to transmit the contests by radio or television throughout the United States and foreign countries." [5]

Similarly, in *Radovich v. National Football League*, 352 U.S. 445, 451–452, 77 S.Ct. 390, 393–394, 1 L.Ed.2d 456 (1957), the court wrote that it had "not extend[ed] the baseball exemption from the antitrust laws to boxing or the theatre [6] because we believe that the volume of interstate business in each, the rationale of *Federal Base Ball*, was such that both activities were in the Act." The court repeated plaintiff's argument that

"part of the business of professional football itself" and "directly tied in and connected" with its football exhibitions is the transmission of games over radio and television into nearly every State of the Union. This is accomplished by contracts which produce a "significant portion of the gross receipts" and without which

"the business of operating a professional football club would not be profitable." The playing of the exhibitions themselves "is essential to the interstate transmission by broadcasting and television" and that the actions of respondents against [plaintiff] were necessarily related to these interstate activities.

*Id.* at 449, 77 S.Ct. at 392.[7] It held the volume of interstate business in football placed it within the provisions of the Sherman Act. Thus, the Supreme Court has refused to extend the baseball exemption to boxing and football because it recognized that extensive broadcasting of those sports thrust them into interstate commerce.

The question posed by defendants HSA and KENR is the obverse of that posed by Judge Hand in *Gardella*: is radio broadcasting so much a part of baseball that it, as well as baseball, is exempt from the antitrust laws. The fact that interstate broadcasting has on the one hand subjected other professional sports to the antitrust laws, but has not on the other hand affected the baseball exemption, is perplexing. One implication of the Supreme Court's upholding of the baseball exemption despite interstate broadcasting would seem to be that the broadcasting is not central enough to the

5. The majority acknowledged that the baseball cases had not taken broadcasting revenues into account.

> Apart from *Federal Base Ball* and *Toolson* it would be sufficient, we believe, to rest on the allegation that over 25% of the revenue from championship boxing is derived from interstate operations through the sale of radio, television and motion picture rights.

*International Boxing*, 348 U.S. at 247, 75 S.Ct. at 264. Justice Frankfurter noted in dissent the logical difficulty with the baseball exemption since "the interstate aspects of baseball and the extent of the exploitation of baseball through mass media are far more extensive than is true of boxing." *Id.* at 248–249, 75 S.Ct. at 265.

6. In *United States v. Shubert*, 348 U.S. 222, 228–30, 75 S.Ct. 277, 281–82, 99 L.Ed. 279 (1955) the Court, holding that "*Toolson* was a narrow application of the rule of *stare decisis*, [and that if] the Toolson holding is to be expanded—or contracted—the appropriate remedy lies with Congress," rejected defendants', producers of theatrical attractions and operators of theatres, argument that businesses built

around the performance of local exhibitions are exempt from the antitrust laws.

7. A year later a federal judge in Texas applied this reasoning to baseball. Finding not that broadcasting is essential to baseball, but that baseball is essential to the broadcasting of baseball, he held that broadcasting of baseball was therefore covered by the baseball exemption. Judge Dooley commented from the bench:

> The telecasting simply lifts the horizon, so to speak, and brings in another set of viewers of the same identical game that those present in the grandstand are seeing at the same time, ordinarily, and I believe its straining reality to suggest that this television business has become a new facet of activity that you can look at apart from the ordinary business of baseball; and I can't follow that because there couldn't be such broadcasting except for the old-fashioned baseball game being played somewhere—the very gist and essence of the baseball business.

*Hale v. Brooklyn Baseball Club, Inc.*, Civil Action No. 1294 (N.D.Tex.1958).

"unique characteristics and needs" of baseball which the exemption was created to protect, to affect that exemption. Thus, although the exhibition of baseball is now a big business "packaged with beer, broadcasting, and other industries," *Kuhn*, Douglas dissent 407 U.S. at 287, 92 S.Ct. at 2114. Radio broadcasting is not a part of the sport in the way in which players, umpires, the league structure and the reserve system are. However, the most reasonable interpretation of the baseball exemption that has emerged from player challenges to the reserve clause system is simply that it is an aberration. This Court's reading of the Supreme Court's opinions is that it should leave the aberration as it finds it, on the narrow ground of *stare decisis.*

## II. *Congressional Action*

The Supreme Court in *Toolson and Flood v. Kuhn*, found that Congress had by its inaction implicitly ratified the *Federal Baseball* exemption. Congress, however, clearly has not extended the exemption to cover other businesses related to baseball. In fact, it has recognized that professional organized sports are involved in extraneous business activities and expressed its judgment that an extension of the baseball exemption to other activities as well as to other sports would contravene the federal antitrust laws. The 1952 House Subcommittee Report No. 2002, entitled "Organized Baseball," 82d Cong., 2d Sess., 230, submitted to the full House by the House Subcommittee on the Study of Monopoly Power pursuant to House Resolution 95, 82d Cong., 1st Sess., which the court relied on in declining to extend the baseball exemption to boxing in *International Boxing Club of New York*, concluded that extension of the baseball exemption "to all professional sports enterprises and to all acts in the conduct of such enterprises" would

> no longer require competition in any facet of business activity of any sport enterprise. Thus the sale of radio and television rights, the management of stadia, the purchase and sale of advertising, the concession industry and many other business activities as well as the aspects of baseball which are solely related to the

promotion of competition on the playing field would be immune and untouchable. Such a broad exemption could not be granted without substantially repealing the antitrust laws.

The Subcommittee recommended against enactment of legislation on baseball, pending judicial interpretation of *Federal Baseball*, and Congress declined to extend the exemption to other sports and activities.

Congress has, contrary to the court's observations in *Flood v. Kuhn*, focused on the question of exemption of the television broadcast of sports from the antitrust laws and has legislated with regard to baseball no differently than it has with regard to football, basketball and hockey. Section 1291 of 15 U.S.C., (1966) (amending 15 U.S.C. § 1291 (1961)) provides in part:

> The antitrust laws as defined in § 12 of this title or in the Federal Trade Commission Act, as amended, shall not apply to any joint agreement by or among persons engaged in or conducting the organized professional team sports of football, baseball, basketball, or hockey, by which any league of clubs participating in professional football, baseball, basketball, or hockey contests sells or otherwise transfers all or any part of the rights of such league's member clubs in the sponsored telecasting of the games of football, baseball, basketball, or hockey, as the case may be, engaged in or conducted by such clubs.

The purpose of this exemption, as stated in Senate Report No. 1087, accompanying H.R. 9096, September 20, 1961, was precisely Justice Holmes' purpose in creating the baseball exemption in *Federal Baseball*, to protect the league structure, to give a league

> the power to make 'package' sales of the television rights of its member clubs to assure the weaker clubs of the league continuing television income and television coverage on a basis of substantial equality with the stronger clubs.
>
> .    .    .    .    .
>
> . . . [Since] should these weaker teams be allowed to flounder, there is danger that

the structure of the league would become impaired and its continued operation imperiled.

The league structure is obviously not implicated in the instant case. Congress has not exempted radio broadcasting from the antitrust laws, and there is no reason to believe Congress intended to exempt radio broadcasting of baseball from those laws. In sum, Congressional action with regard to antitrust exemptions for professional sports do not support defendants' position.

### III. Judicial Application of the Exemption

The baseball exemption arose and has been applied by the courts solely in disputes between players and team owners or a league. By contrast, in antitrust actions involving contracts between baseball teams or players on the one hand, and non-exempt business enterprises on the other, no court has granted a dismissal on the ground that baseball is somehow implicated. In fact, in such cases, the baseball exemption has not been raised in a jurisdictional challenge either by the parties or by the courts which are bound by the law to raise jurisdictional issues. Federal Rules of Civil Procedure, Rule 12(h)(3); *Stanley v. Central Intelligence Agency*, 639 F.2d 1146, 1159 (5th Cir. 1981); *Marshall v. Gibson's Products, Inc. of Plano*, 584 F.2d 668, 671–2 (5th Cir. 1978).

The Court of Appeals for the Seventh Circuit in *Charles O. Finley & Co., Inc. v. Kuhn*, 569 F.2d 527, 540–541 (7th Cir. 1978), *cert. denied*, 439 U.S. 876, 99 S.Ct. 214, 58 L.Ed.2d 190 (1978), rejected the argument that the baseball exemption applies only to the reserve system and not to a baseball club owner's claim that the Commissioner of Baseball, by disapproving the club's agreement to sell its contract rights for players services conspired to eliminate the club from baseball in violation of federal antitrust laws. The court concluded from its reading of *Federal Base Ball, Toolson, Flood v. Kuhn*, and *Radovich* that "the Su-

preme Court intended to exempt the business of baseball, not any particular facet of that business, from the federal antitrust laws." However, it "recognize[d] that this exemption does not apply wholesale to all cases which may have some attenuated relation with the business of baseball," *id.*, at 541, n. 5, and cited as an example *Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 365 F.Supp. 235 (N.D.Cal.1972) *rev'd on other grounds* 512 F.2d 1264 (9th Cir. 1975).

In *Twin City* defendant, owner of a baseball team, counterclaimed for antitrust violations challenging a twenty-year-term exclusivity "follow the franchise" provision in his contract with a concessionaire. Under the parties' contract plaintiff concessionaire exchanged $150,000 and twenty-nine percent of the receipts from concession items sold to spectators for concession equipment and a $100,000 loan. The concession services included advertising and program printing as well as food. Nevertheless, neither the concessionaire nor the court raised the baseball exemption as a jurisdictional defense to this antitrust claim. The radio broadcasting contract at issue in the instant case, like a concession contract, brings revenue to the baseball team.[8] If the contract of a concessionaire, whose programs, advertising and food are part of the spectators' experience of the baseball game, is not covered by the baseball exemption, then neither should the broadcasting contract which provides transmission of merely an aural version of the game across the airwaves.

In the recent case of *Fleer Corporation v. Topps Chewing Gum, Inc., et al.*, 658 F.2d 139, 1981–1982 Trade Cases ¶ 64,249, (3rd Cir. 1981) plaintiff sued Topps and the major league baseball players association (MLBPA), which negotiates and enforces collective bargaining agreements between players and team owners and is the exclusive marketing agent for the publicity rights of the players as a group, on the grounds that defendants excluded competi-

---

**8.** Plaintiff alleges in its complaint, ¶ 19 at p. 20, that the "purpose of [Astros] broadcasts [is] to keep fans abreast of a game's developments . . . to promote Astro ticket sales at upcoming home games and thereby increase revenue for the Astros . . . (and to) raise revenue directly for the Astros by sales of advertising on the broadcast."

tion in the sale of baseball cards by individual licensing agreements with each player and an agreement between Topps and the MLBPA which renegotiated the players' earlier contracts. Defendants did not urge, and the court did not raise, the baseball exemption. Clearly, the exemption is no more applicable to an antitrust suit on a broadcasting contract than it is to a suit on baseball players' licensing agreements for baseball cards.

## IV. *Conclusion*

The focus of the court in an antitrust action is the particular activity and the particular market in question. Recently, the United States Court of Appeals for the District of Columbia reversed a summary judgment for defendants charged with discouraging a Catholic book retailer from distributing a book in violation of the antitrust laws, on the basis of a First Amendment exemption to the antitrust laws. In *Costello Publishing Co. et al. v. Rotelle et al.*, 670 F.2d 1035, 1981–1982 Trade Cases (CCH) ¶ 64,352, (D.C.Cir.1981) it held that the "actions of defendant intervenors are [not] altogether exempt from antitrust scrutiny simply because their motives were religious," and stated, in remanding for complete factual findings,

> [T]he court must determine the extent to which the concerns of the antitrust laws are implicated by the activity challenged. . . . [I]n every case, the court must carefully assess the nature and extent of the antitrust violations including their market impact, against the religious goals sought to be implemented before deciding that the activities are exempt.

*Id.*, at 1046, 1049, 1050, 1981–1982 Trade Cases (CCH) at 74,630, 74,632–74,633.

In the instant case the Court must reconcile the Supreme Court's rulings exempting baseball from antitrust proscriptions with the antitrust laws favoring competition. The issue in the case is not baseball but a distinct and separate industry, broadcasting. Defendant, HSA, is sued in its capacity as a "network." The reserve clause and other "unique characteristics and needs" of the game have no bearing at all on the questions presented. To hold that a radio station contract to broadcast baseball games should be treated differently for antitrust law purposes than a station's contract to broadcast any other performance or event would be to extend and distort the specific baseball exemption, transform it into an umbrella to cover other activities and markets outside baseball and empower defendants radio station and "network" to use that umbrella as a shield against the statutes validly enacted by Congress.[9]

With all due respect, this Court concurs with Judge Friendly in his "belief that *Federal Baseball* was not one of Mr. Justice Holmes' happiest days, that the rationale of *Toolson* is extremely dubious and that, to use the Supreme Court's own adjectives, the distinction between baseball and other professional sports is 'unrealistic,' 'inconsistent' and 'illogical.' *Radovich v. National Football League*, 352 U.S. 445, 452, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957)." It shares his view that "changes in the economics of the sport even since *Toolson*, especially the increasing importance of revenues from interstate television broadcasts, make baseball's immunity from the antitrust laws more anomolous than ever." *Salerno v. American League*, 429 F.2d 1003, 1005 (2d Cir. 1970), *cert. denied, sub nom. Salerno v. Kuhn*, 400 U.S. 1001, 91 S.Ct. 462, 27

---

**9.** The Court is also persuaded by plaintiff's argument that an exempt baseball team, like a labor union or agricultural cooperative which is exempted from the Sherman Act by statute, loses its exemption when it combines with a non-exempt radio station, *Ramsey v. United Mine Workers*, 401 U.S. 302, 91 S.Ct. 658, 28 L.Ed.2d 64 (1971); *United States v. Concentrated Phosphate Export Ass'n.*, 393 U.S. 199, 89 S.Ct. 361, 21 L.Ed.2d 344 (1968), *Case-Swayne Co. v. Sunkist Growers, Inc.*, 389 U.S. 384, 88

S.Ct. 528, 19 L.Ed.2d 621 (1967), *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), *United States v. Borden Co.*, 308 U.S. 188, 204–05, 60 S.Ct. 182, 191, 84 L.Ed. 181 (1937), and *Texas Communication System, Inc. et al. v. American Telephone and Telegraph Co. et al.*, 615 F.2d 1372 (5th Cir. 1980), *rehearing denied* 1980. This is another expression of the principle that antitrust laws are applied or not applied to specific conduct in a specific market.

L.Ed.2d 452 (1971). The baseball exemption today is an anachronism. Defendants have not presented a reason to extend it. Accordingly, defendants' Motions to Dismiss are DENIED.