**MINNESOTA TWINS PARTNERSHIP, petitioner, Appellant,**

**Milwaukee Brewers Baseball Club, Limited Partnership, et al., petitioners, Appellants,**

v.

**STATE of Minnesota, by Michael A. HATCH, its Attorney General, Respondent.**

No. C9–98–890.

Supreme Court of Minnesota.

April 29, 1999.

Roger J. Magnuson, Peter W. Carter, Dorsey & Whitney LLP, Minneapolis, Gregory P. Joseph, John Sullivan, Fried, Frank, Harris, Shriver & Jacobson, New York, NY, for appellants MN Twins Partnership.

Charles R. Shreffler, Shreffler Law Firm, Mendota Heights, Robert J. Kheel, Wilkie, Farr & Gallagher, New York, NY, for appellants Milwaukee Brewers Baseball Club, et al.

Mike Hatch, Minnesota Attorney General, Thomas F. Pursell, Senior Counsel, Peter B. Hofrenning, Ann Beimdiek Kinsella, Julie Y.

Ralston, Assistant Attorneys General, St. Paul, for respondent State of Minnesota.

Stephen F. Ross, University of Illinois College of Law, Champaign, Il, for amici curiae Consumer Federation of America and Fans Inc.

## OPINION

PAUL H. ANDERSON, Justice.

We are asked to determine if appellants must comply with civil investigative demands issued by the Minnesota Attorney General's Office. The Attorney General is requesting information on the proposed sale and relocation of the Minnesota Twins baseball franchise to North Carolina and a potential boycott of Minnesota by Major League Baseball[1] in violation of state antitrust laws. The appellants allege that their conduct is exempt from Minnesota's antitrust laws because the United States Supreme Court has held that the business of professional baseball is exempt from compliance with federal antitrust laws. The district court rejected this argument and issued an order compelling compliance with the civil investigative demands. The Minnesota Court of Appeals denied review, holding that the issues presented were "premature." Appellants now ask us to reverse the court of appeals' denial of review and remand the matter to that court to consider the issues on the merits. We instead reverse the district court's order to compel compliance with the civil investigative demands and remand.

The facts are not in dispute. Early in October 1997, Carl R. Pohlad, on behalf of the Minnesota Twins Partnership, announced that he had signed a letter of intent to sell the Twins to North Carolina businessman Donald C. Beaver and the other investors of North Carolina Major League Baseball, L.L.C. (NCMLB). The sale was contingent on the Minnesota Legislature's refusal to authorize public funding for a new baseball stadium by November 30, 1997. Within days of the announcement of the proposed sale, a delegation from Minnesota, including then-Governor Arne H. Carlson and key legislators, traveled to Milwaukee to confer with then-Acting Commissioner of Major League Baseball Allan "Bud" Selig. Selig told the delegation that if a publicly-funded stadium was not authorized and built, the other Major League Baseball (MLB) team owners would approve the Twins' move from Minnesota. The Minnesota Legislature subsequently rejected all stadium bills introduced in the special legislative session called by Governor Carlson.

On December 17, 1997, the Attorney General served the Twins with civil investigative demands[2] (CIDs) as part of an investigation into possible violations of state antitrust laws. The other appellants, Milwaukee Brewers Baseball Club, L.P. (Brewers), the American League of Professional Baseball Clubs, Inc. (American League), the National League of Professional Baseball Clubs, Inc. (National League), the Office of the Commissioner of Major League Baseball, and NCMLB, were also served with the CIDs on that date.[3] The CIDs served on the Twins requested a broad array of documents concerning, among other things, the financial viability of the Hubert H. Humphrey Metrodome (the Twins' current stadium), the methods used by other professional baseball teams to ob-

---

1. Although there is no legal entity known as Major League Baseball, this term is commonly used to refer to the joint operations of the American League of Professional Baseballs Clubs, Inc. and National League of Professional Baseball Clubs, Inc. *See* Joseph J. McMahon, Jr. and John P. Rossi, *History and Analysis of Baseball's Antitrust Exemption,* 2 Vill. Sports & Ent. L.F. 213, 230–31 (1996) (discussing 1903 agreement between American and National Leagues).

2. The Attorney General's Office has the authority to demand discovery from persons suspected of violating state laws governing trade and com-

merce. Minn.Stat. § 8.31, subd. 2 (1998). This discovery is demanded through documents called civil investigative demands which issue directly from the Attorney General's Office. *See Kohn v. State by Humphrey,* 336 N.W.2d 292, 295 (Minn. 1983).

3. On March 11, 1998, appellants Brewers, American League, National League, Office of the Commissioner of Baseball, and NCMLB intervened; the intervenors were joined as appellants on appeal.

tain new stadia, the potential purchase of the Twins by Beaver and his group of North Carolina investors, and the 1961 relocation of the Washington Senators to Minnesota. The CIDs also included numerous interrogatories seeking information on the Twins' efforts to procure a new stadium, as well as information on the structure, governance, and revenues of MLB.

The CIDs served on appellant NCMLB requested information on attempts to obtain a MLB expansion franchise or to purchase and relocate the Twins. The CIDs served on appellants Brewers, American League, National League, and the Office of the Commissioner requested, among other things, information on past MLB expansion, team relocation, and stadia financing, as well as information specific to the Twins' potential sale and relocation. Because all appellants have substantially the same interests before us, we will hereinafter refer to all appellant parties as the "Twins."

The Twins filed a motion for a protective order under Minn. R. Civ. P. 26.03 in Ramsey County District Court in January 1998. The Twins argued (a) that the Attorney General's investigation was precluded by professional baseball's exemption from antitrust laws; (b) that the investigation was precluded by the Commerce Clause of the United States Constitution; and (c) that the CIDs were overly broad and compliance was unduly burdensome. On February 9, 1998, the state filed a motion to compel compliance with the CIDs.

On April 20, 1998, the district court denied the Twins' motion for a protective order and granted the state's motion to compel compliance with the CIDs. The court determined that the issue of whether professional baseball was exempt from Minnesota's antitrust laws under either federal caselaw or the Commerce Clause was a threshold issue that must be considered before the CIDs could be enforced. After a thorough examination of the breadth of the antitrust exemption found in the United States Supreme Court's "baseball trilogy"[4] and the treatment by other

courts of professional baseball's exemption, the district court was persuaded by the "painstaking analysis" found in *Piazza v. Major League Baseball,* 831 F.Supp. 420 (E.D.Pa.1993), and found baseball's exemption to be limited to the "narrow area of the reserve clause." The court also found the Twins' Commerce Clause argument unpersuasive, finding the issue impossible to resolve absent a factual record.

The Twins moved to certify the April 20 order directly to the court of appeals. On May 11, 1998, the district court issued an order denying this request. In the same order, the court also limited the documents necessary for compliance with the CIDs to those generated within the last six years that dealt with (1) revenue sharing within MLB; (2) relocation or sale of MLB teams; and (3) MLB communications regarding "construction of and methods for obtaining new stadia." The Twins petitioned the court of appeals for discretionary review of the April 20 order.

The court of appeals denied review in an order opinion, holding that the question of professional baseball's exemption from antitrust laws under either federal caselaw or the Commerce Clause was "premature." The court's order stated specifically that the Twins retained the right to raise the exemption as an affirmative defense should prosecution occur. The Twins appealed, arguing that the court of appeals erred in not reaching the merits of the argument that professional baseball's exemption from federal antitrust laws precluded prosecution under state antitrust laws.

## I.

■ A district court has broad discretion "to issue discovery orders" and will be reversed on appeal only upon an abuse of such discretion. *Shetka v. Kueppers, Kueppers, Von Feldt & Salmen,* 454 N.W.2d 916, 921 (Minn.1990). In addressing a challenge to a civil investigative demand, a district court "is not required to weigh evidence and resolve factual disputes in the same manner

---

4. *Flood v. Kuhn,* 407 U.S. 258, 92 S.Ct. 2099, 32 L.Ed.2d 728 (1972); *Toolson v. New York Yankees, Inc.,* 346 U.S. 356, 74 S.Ct. 78, 98 L.Ed. 64

(1953); *Federal Baseball Club of Baltimore, Inc. v. National League of Prof'l Baseball Clubs, Inc.,* 259 U.S. 200, 42 S.Ct. 465, 66 L.Ed. 898 (1922).

as at a trial." *Kohn v. State by Humphrey,* 336 N.W.2d 292, 296 (Minn.1983).

The Attorney General has the authority to investigate and prosecute "violations of the law of this state respecting unfair, discriminatory, and other unlawful practices in business, commerce, or trade." Minn.Stat. § 8.31, subd. 1 (1998). The Attorney General may use civil investigative demands to obtain discovery "from any person regarding any matter, fact or circumstance, not privileged, which is relevant" to the investigation. Minn. Stat. § 8.31, subd. 2. No civil action need be commenced before the issuance of civil investigative demands; all that is required is that the Attorney General have "reasonable grounds to believe that any person has violated, or is about to violate, any of the laws" over which the Attorney General has investigative authority. *Id.* The scope of the inquiry must be within the authority of the Attorney General, the information requested must be "reasonably relevant," and the demand for documents "not too indefinite." *Kohn,* 336 N.W.2d at 297 (quoting *United States v. Morton Salt Co.,* 338 U.S. 632, 652, 70 S.Ct. 357, 94 L.Ed. 401 (1950)). A claim of exemption from antitrust laws defeats an otherwise validly issued civil investigative demand only when the activities being investigated are clearly covered by the exemption. *See Associated Container Transp. (Australia) Ltd. v. United States,* 705 F.2d 53, 59 (2d Cir. 1983).

The Attorney General issued the CIDs to the Twins pursuant to an investigation of potential violations of Minnesota laws prohibiting (a) any "contract, combination, or conspiracy between two or more persons in unreasonable restraint of trade or commerce;"[5] (b) the "establishment, maintenance, or use" of monopoly power;[6] and (c) price fixing, market allocation, and boycotts.[7] In briefs to the district court and this court, the state elaborated on its concern regarding a possible illegal boycott of Minnesota by the Twins, asserting that "it is reasonable to infer that the owners of MLB teams are acting in concert to effect an illegal boycott and/or a price fixing agreement. In addition, the evidence would also support an inference that [MLB] is unlawfully exercising joint monopoly power." For supporting evidence, the state points to numerous newspaper accounts and press releases containing allegations and inferences that the Twins, as well as the rest of MLB, would boycott Minnesota by prohibiting any major league baseball team from locating here in the future if a publicly-financed stadium was not built.

The state also cites several cases that limit the scope of professional baseball's exemption from antitrust laws. Arguing that there is no clear exemption for all antitrust claims brought against professional baseball, the state urges this court to allow the investigation to continue by affirming the court of appeals and the district court's order compelling compliance with the CIDs. The state argues that the extent of professional baseball's exemption and the effect of the Commerce Clause can be litigated properly only after the state makes specific charges and a factual record is developed.

The Twins' primary argument is not that the CIDs are outside the authority of the Attorney General under Minn.Stat. § 8.31, subd. 1, but that professional baseball is exempt from prosecution under antitrust laws both through a judicially created exemption and through the Commerce Clause. Thus, the threshold issue is the scope of professional baseball's exemption from Minnesota's antitrust laws, a legal issue we review de novo. *See Jacka v. Coca–Cola Bottling Co.,* 580 N.W.2d 27, 32 (Minn.1998).

Minnesota's antitrust laws are generally interpreted consistently with federal courts' construction of federal antitrust laws. *See State by Humphrey v. Alpine Air Products, Inc.,* 490 N.W.2d 888, 894 (Minn.App. 1992), *aff'd,* 500 N.W.2d 788 (Minn.1993); *see also State v. Duluth Bd. of Trade,* 107 Minn. 506, 517, 121 N.W. 395, 399 (1909). Both state and federal antitrust laws are to be broadly construed. *Abbott Labs. v. Portland*

---

5. Minn.Stat. § 325D.51 (1998).

6. Minn.Stat. § 325D.52 (1998).

7. Minn.Stat. § 325D.53, subd. 1 (1998).

*Retail Druggists Ass'n, Inc.*, 425 U.S. 1, 11, 96 S.Ct. 1305, 47 L.Ed.2d 537 (1976); *Minnesota–Iowa Television Co. v. Watonwan T.V. Improvement Ass'n*, 294 N.W.2d 297, 305 (Minn.1980). This means that "exemptions from the antitrust laws must be construed narrowly." *Union Labor Life Ins. Co. v. Pireno*, 458 U.S. 119, 126, 102 S.Ct. 3002, 73 L.Ed.2d 647 (1982). A party claiming exemption bears the burden of proving that its conduct is exempt from antitrust laws. *Henderson Broad. Corp. v. Houston Sports Ass'n, Inc.*, 541 F.Supp. 263, 265 (S.D.Tex. 1982).

The United States Supreme Court first announced professional baseball's exemption from federal antitrust laws in *Federal Baseball Club of Baltimore, Inc. v. National League of Prof'l Baseball Clubs, Inc.*, 259 U.S. 200, 42 S.Ct. 465, 66 L.Ed. 898 (1922). The plaintiff in *Federal Baseball*, a member of the Federal League, was a Baltimore baseball club that found itself without competitors following the National League's buyout of the seven other Federal League teams. *Id.* at 207, 42 S.Ct. 465. The Baltimore club, as the sole remaining member of the Federal League, sued the National League under the Sherman Antitrust Act. *Id.* The Supreme Court, in an opinion written by Justice Oliver Wendell Holmes, held that the Sherman Antitrust Act did not apply to baseball because baseball did not involve interstate commerce. Justice Holmes wrote:

> The business is giving exhibitions of base ball, which are purely state affairs. It is true that, in order to attain for these exhibitions the great popularity that they have achieved, competitions must be arranged between clubs from different cities and States. But the fact that in order to give the exhibitions the Leagues must induce free persons to cross state lines and must arrange and pay for their doing so is not enough to change the character of the

business. * * * [T]he transport is a mere incident, not the essential thing. That to which it is incident, the exhibition, although made for money would not be called trade or commerce in the commonly accepted use of those words.

*Id.* at 208–09, 42 S.Ct. 465.

Although the holding of *Federal Baseball* could logically be applied to any type of live performance or exhibition, the Supreme Court never extended it to any other business. The Court exhibited its unwillingness to extend the exemption from antitrust laws to other types of performances when it held the following year that the baseball exemption set forth in *Federal Baseball* did not necessarily apply to the business of vaudeville performances. *See Hart v. B.F. Keith Vaudeville Exch.*, 262 U.S. 271, 273–74, 43 S.Ct. 540, 67 L.Ed. 977 (1923). Although vaudeville, like professional baseball, involved live performances made possible by transporting people and equipment across state lines, the Court reasoned that an antitrust suit against a vaudeville organization was not frivolous because "the apparatus sometimes is more important than the performers" and therefore commerce was potentially involved. *Id.* at 272–74, 43 S.Ct. 540.

The issue of baseball's exemption next came before the Supreme Court 30 years after *Federal Baseball*, during which time judicial understanding of what constituted "interstate commerce" had changed considerably. *See, e.g., Wickard v. Filburn*, 317 U.S. 111, 125, 128–29, 63 S.Ct. 82, 87 L.Ed. 122 (1942) (stating that the growing of wheat for intrastate consumption was governed by the Commerce Clause because Congress determined that the activity "exerts a substantial economic effect on interstate commerce"). In *Toolson v. New York Yankees, Inc.*, 346 U.S. 356, 74 S.Ct. 78, 98 L.Ed. 64 (1953), the Court considered a ballplayer's claim that baseball's reserve system[8] violated federal

---

8. The reserve system, as applied through a reserve clause contained in every ballplayer's contract, meant that the initial team with which a ballplayer signed a contract had "a continuing and exclusive right to his services." *Toolson*, 346 U.S. at 362 n. 10, 74 S.Ct. 78 (Burton, J., dissenting). The club could unilaterally renew the player's contract when it expired, or release the player, or assign the player's contract to any other team, which would then have the same rights to the player's services. *See id.* at 362–63, n. 10, 74 S.Ct. 78. All Major League Baseball clubs agreed to abide by this system, meaning that a player who wished to break out of the reserve system and negotiate for himself would

antitrust laws. *See id.* at 362, 74 S.Ct. 78. Pitcher George Toolson, who had signed a contract to play with the New York Yankees, refused to report from one farm club to another. Jeffrey S. Moorad, *Major League Baseball's Labor Turmoil: The Failure of the Counter-revolution,* 4 Vill. Sports & Ent. L.J. 53, 60 (1997). The Yankees then placed Toolson on the club's ineligible list, but because of the reserve system, no other team would sign him. *See id.* at 56, 60.

In a one-paragraph per curiam opinion, the Supreme Court noted that, after *Federal Baseball,* Congress had taken the Court's ruling "under consideration," [9] but had declined to legislatively overrule professional baseball's exemption. *Toolson,* 346 U.S. at 357, 74 S.Ct. 78. Declining to overrule *Federal Baseball,* the Court left any change to Congress:

> The business [of baseball] has thus been left for thirty years to develop, on the understanding that it was not subject to existing antitrust legislation. * * * We think that if there are evils in this field which now warrant application to it of the antitrust laws it should be by legislation. Without re-examination of the underlying issues, the judgments below are affirmed on the authority of [*Federal Baseball* ], so far as that decision determines that *Congress had no intention of including the business of baseball within the scope of the federal antitrust laws.*

*Id.* (emphasis added).

In several cases following *Toolson,* the Supreme Court made it clear that professional

baseball's exemption rested on "a narrow application of the rule of *stare decisis* " applicable only to baseball. *United States v. Shubert,* 348 U.S. 222, 230, 75 S.Ct. 277, 99 L.Ed. 279 (1955); *see also Radovich v. National Football League,* 352 U.S. 445, 451–52, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957) (stating that the exemption was limited to "the business of baseball"). The Court declined to extend the exemption to theatre performances,[10] boxing,[11] football,[12] or basketball.[13] Were the exemption created by *Federal Baseball* not in existence, the Court stated it would treat baseball's reserve system the same as reserve systems of other professional sports. *Haywood v. National Basketball Ass'n,* 401 U.S. 1204, 1205, 91 S.Ct. 672, 28 L.Ed.2d 206 (1971).[14]

The Supreme Court's most recent and most thorough look at professional baseball's exemption came in *Flood v. Kuhn,* 407 U.S. 258, 92 S.Ct. 2099, 32 L.Ed.2d 728 (1972). Like *Toolson, Flood* involved a challenge to baseball's reserve system. *Id.* at 259, 92 S.Ct. 2099. St. Louis Cardinals centerfielder Curt Flood brought an antitrust suit against the Commissioner of Baseball after the Commissioner denied Flood's request to become a free agent rather than report to the Philadelphia Phillies after being unwillingly traded to that team by the Cardinals. *Id.* at 264–65, 92 S.Ct. 2099. Flood filed suit against the Commissioner, the presidents of the American and National Leagues, and the then–24 individual major league baseball clubs, charging, inter alia, violations of both federal and

be declared ineligible and no other team would sign him. *Id.*

**9.** In *Toolson,* the dissent noted that in 1952 the Subcommittee on the Study of Monopoly Power issued to the House of Representatives Committee on the Judiciary a report that found the business of baseball to be interstate in nature. *Toolson,* 346 U.S. at 358–59, 74 S.Ct. 78 (Burton, J., dissenting) (citing H.R.Rep. No. 82–2002, at 4, 5 (1952)). The 1952 report concluded that the reserve system was so vital to the stability of baseball that legislation condemning the reserve clause was not justified. *See Flood v. Kuhn,* 407 U.S. 258, 272–73, 92 S.Ct. 2099, 32 L.Ed.2d 728 (1972) (citing the 1952 study as evidence of Congressional approval of baseball's antitrust exemption).

**10.** *Shubert,* 348 U.S. at 230., 75 S.Ct. 277

**11.** *United States v. International Boxing Club of New York,* 348 U.S. 236, 242, 75 S.Ct. 259, 99 L.Ed. 290 (1955).

**12.** *Radovich,* 352 U.S. at 451–52, 77 S.Ct. 390.

**13.** *Haywood v. National Basketball Association,* 401 U.S. 1204, 1205, 91 S.Ct. 672, 28 L.Ed.2d 206 (1971).

**14.** "Basketball * * * does not enjoy exemption from the antitrust laws. Thus the decision in this suit would be similar to the one on baseball's reserve clause which our decisions exempting baseball from the antitrust laws have foreclosed." *Haywood,* 401 U.S. at 1205, 91 S.Ct. 672.

state antitrust laws. *Id.* at 265–66, 92 S.Ct. 2099. Following a trial, the federal district court held that *Federal Baseball* and *Toolson* were dispositive of the antitrust claims and entered judgment for the defendants. *Flood v. Kuhn,* 309 F.Supp. 793 (S.D.N.Y.1970), *aff'd,* 443 F.2d 264 (2d Cir.1971), *aff'd,* 407 U.S. 258, 92 S.Ct. 2099, 32 L.Ed.2d 728 (1972). The Second Circuit Court of Appeals affirmed. *Flood,* 443 F.2d at 264.

The Supreme Court affirmed in an opinion written by Justice Harry A. Blackmun. *Flood,* 407 U.S. at 258, 92 S.Ct. 2099. In *Flood,* the Court delineated the circumstances surrounding *Federal Baseball* and outlined the application of *Federal Baseball* in subsequent cases. *Id.* at 269–80, 92 S.Ct. 2099. The pattern that emerges is clear: the exemption set forth in *Federal Baseball* is limited strictly to professional baseball, and despite frequent invitations to review the issue, Congress has allowed the anomalous exemption to remain. *Id.* at 281–82, 92 S.Ct. 2099. The Court acknowledged that the legal footings for the exemption were no longer valid, stating that "[p]rofessional baseball is a business and it is engaged in interstate commerce," but held that baseball remained exempt from federal antitrust law under the stare decisis of *Federal Baseball* and *Toolson.* *Id.* at 282, 92 S.Ct. 2099. The Court resolved any resulting inconsistency by embracing it:

> Even though others might regard [the aberration of *Federal Baseball* and *Toolson* ] as "unrealistic, inconsistent, or illogical," * * * the aberration is an established one and one that has been recognized * * * [by] a total of five[ [15]] consecutive cases in this Court. It is an aberration that has been with us now for half a century, one heretofore deemed fully entitled to the benefit of *stare decisis,* and one that has survived the Court's expanding concept of interstate commerce. It rests on a recognition and an acceptance of baseball's unique characteristics and needs.

*Id.* (internal citation omitted). The majority opinion ends by reciting the holding of *Toolson* that "the business of baseball" is exempt from antitrust legislation based on stare decisis and congressional inaction. *See id.* at 285, 92 S.Ct. 2099.

Chief Justice Warren E. Burger concurred. *Flood,* 407 U.S. at 285, 92 S.Ct. 2099. Although having "grave reservations as to the correctness of *Toolson,*" the Chief Justice stated that "[c]ourts are not the forum in which this tangled web ought to be unsnarled." *Id.* at 285–86, 92 S.Ct. 2099 (Burger, C.J., concurring). Justice William O. Douglas, joined by Justice William J. Brennan, dissented and disagreed with the Chief Justice's assessment of the proper forum for change, stating that "[*Federal Baseball* ] is a derelict in the stream of law that we, its creator, should remove." *Id.* at 286, 92 S.Ct. 2099 (Douglas, J., dissenting).

While engagingly written, the *Flood* opinion is not clear about the extent of the conduct that is exempt from antitrust laws. The opinion begins by identifying the issue as whether "professional baseball's *reserve system* is within the reach of the federal antitrust laws." *Flood,* 407 U.S. at 259, 92 S.Ct. 2099 (emphasis added). The facts before the Supreme Court clearly implicated only the reserve clause. *Id.* at 264–66, 92 S.Ct. 2099. However, the holding is broader, stating that "we adhere once again to *Federal Baseball* and *Toolson* and to their application *to professional baseball.*" *Id.* at 284, 92 S.Ct. 2099 (emphasis added). Thus, when interpreting the scope of *Flood,* we are seemingly offered the choice between either a narrow or a broad reading of professional baseball's antitrust exemption.

The "great weight of federal cases" [16] hold that *Flood* exempts the entire business of baseball from federal and state antitrust claims. *See, e.g., Charles O. Finley & Co. v. Kuhn,* 569 F.2d 527, 541 (7th Cir.1978) (holding that it is "clear" that the entire "business of baseball" is exempt from antitrust claims);

---

**15.** The five cases are *Federal Baseball,* 259 U.S. 200, 42 S.Ct. 465, 66 L.Ed. 898; *Toolson;* 346 U.S. 356, 74 S.Ct. 78, 98 L.Ed. 64; *International Boxing,* 348 U.S. 236, 75 S.Ct. 259, 99 L.Ed. 290; *Shubert,* 348 U.S. 222, 75 S.Ct. 277, 99 L.Ed.

279; and *Radovich,* 352 U.S. 445, 77 S.Ct. 390, 1 L.Ed.2d 456.

**16.** *See Butterworth v. National League of Prof'l Baseball Clubs,* 644 So.2d 1021, 1025 (Fla.1994).

*Portland Baseball Club, Inc. v. Kuhn,* 491 F.2d 1101, 1103 (9th Cir.1974) (per curiam) (holding antitrust claim properly dismissed, citing *Flood* ); *McCoy v. Major League Baseball,* 911 F.Supp. 454, 457 (W.D.Wash. 1995) (holding that *Flood*'s reaffirmation of *Toolson* extended immunity to "the business of baseball").

A different interpretation of *Flood* can be found in *Piazza v. Major League Baseball,* 831 F.Supp. 420 (E.D.Pa.1993). *Piazza* was precipitated by a situation analogous to the one before this court—the threatened move of the San Francisco Giants baseball club to Florida. *Id.* at 422–23. A partnership of investors, including plaintiff Vincent Piazza,[17] signed a letter of intent with Robert Lurie, the owner of the Giants, to purchase the team for $115 million. *Id.* at 422. The chair of MLB's Ownership Committee directed Lurie to negotiate with other potential purchasers in violation of the letter of intent and the Ownership Committee refused to grant the partnership the necessary permission to purchase and move the team. *Id.* at 422–23. The team was eventually sold to a group of San Francisco investors for $15 million less than Piazza's partnership had offered. John Gibeaut, *Skybox Shakedown,* A.B.A.J., June 1998, at 68, 71.

Piazza sued MLB on a number of grounds, including violations of the Sherman Antitrust Act. *Piazza,* 831 F.Supp. at 423–24. MLB moved to dismiss, arguing that "plaintiffs' federal claims fail to state a cause of action" and that the court lacked subject matter jurisdiction. *Id.* at 421. The *Piazza* court interpreted the Supreme Court's statement in *Flood* that baseball was a business engaged in interstate commerce as limiting the scope of the exemption to the reserve clause at issue in *Flood* and *Toolson.* . *Id.* at 435–38. Hence, the *Piazza* court reasoned, the broad exemption articulated by other courts is an inappropriate application of stare decisis that erroneously expands professional baseball's exemption beyond the facts of *Flood* and *Toolson.* *Id.* at 437–48. Even applying a broad exemption, the court concluded that the ownership of baseball franchises had not been analyzed in light of *Federal Baseball* and therefore a factual record was necessary before a determination could be made.[18] *Id.* at 440–41.

In the present case, the Ramsey County District Court found *Piazza* to be more persuasive than other federal cases that outlined a broader exemption. The court concluded that "the ruling in *Flood* confines [baseball's] antitrust exemption to the narrow area of the reserve clause." Because the state's allegations "go far beyond the question of the reserve system," the court issued an order compelling compliance with the CIDs. Although the court of appeals did not address the merits of the district court's legal analysis, its holding that the issues were "premature" is consistent with the position that professional baseball's antitrust exemption exists only as an affirmative defense to specific charges and not as a blanket of immunity from any antitrust investigation.

The *Piazza* opinion is a skillful attempt to make sense of the Supreme Court's refusal to overrule *Federal Baseball,* an opinion generally regarded as "not one of Mr. Justice Holmes' happiest days." *Salerno v. American League of Prof'l Baseball Clubs,* 429

**17.** Vincent Piazza was a childhood friend of former Los Angeles Dodgers manager Tommy Lasorda, who, as a favor, drafted Piazza's son Mike as the 1389th selection in the 1988 amateur draft. John W. Guarisco, *"Buy Me Some Peanuts and Cracker Jack," But You Can't Buy The Team: The Scope and Future of Baseball's Antitrust Exemption,* 1994 U. Ill. L.Rev. 651, 659 n. 91 (citing Mel Antonen, *Piazza Works Hard on Fundamentals,* USA Today, Oct. 28, 1993, at 3C). Mike Piazza played catcher for the Dodgers well enough to be named the 1993 National League Rookie of the Year. Mark T. Gould, *Baseball's Antitrust Exemption: The Pitch Gets Closer and Closer,* 5 Seton Hall J. Sport L. 273, 283 n. 38 (1995). Traded to the Florida Marlins on May 15, 1998, and then to the New York Mets on May 22, 1998, Mike Piazza has been named to the National League All–Star Team for six consecutive seasons, thus making Lasorda's favor to a childhood friend a phenomenally wise decision. *The Sporting News,* "Player Profiles – Mike Piazza" (visited Apr. 23, 1999) <http://www.sportingnews. com/baseball/players/4928>.

**18.** One day after a congressional committee voted to strip professional baseball of its antitrust exemption, the remanded claim was settled, precluding development of a factual record. Gibeaut, A.B.A.J., June 1998 at 71. The exemption has never been eliminated by Congress.

F.2d 1003, 1005 (2d Cir.1970), *cert. denied,* 400 U.S. 1001, 91 S.Ct. 462, 27 L.Ed.2d 452 (1971). But *Piazza* ignores what *is* clear about *Flood*—that the Supreme Court had no intention of overruling *Federal Baseball* or *Toolson* despite acknowledging that professional baseball involves interstate commerce. Although the facts of *Flood* deal only with baseball's reserve system, the Court's conclusion in *Flood* is unequivocal:

> We repeat for this case what was said in *Toolson:*
>
>> "Without re-examination of the underlying issues, the (judgment) below (is) affirmed on the authority of [*Federal Baseball]* * * *, so far as that decision determines that Congress had no intention of including the business of baseball within the scope of the federal antitrust laws." 346 U.S. at 357, 74 S.Ct. 78.
>
> And what the Court said in *Federal Baseball* in 1922 and what it said in *Toolson* in 1953, we say again here in 1972: the remedy, if any is indicated, is for congressional, and not judicial, action.

*Flood,* 407 U.S. at 285, 92 S.Ct. 2099.

As intellectually attractive as the *Piazza* alternative is, we are compelled to accept the paradox the Supreme Court acknowledged in *Flood* when it declined to overrule *Federal Baseball.* To borrow a phrase from the concurrence in *Flood,* this court is "not the forum in which this tangled web ought to be unsnarled." *Flood,* 407 U.S. at 286, 92 S.Ct. 2099 (Burger, C.J., concurring). Professional baseball's exemption from antitrust laws may be an aberration, but we agree with those courts that believe "the Supreme Court should retain the exclusive privilege of overruling its own decisions." *McCoy,* 911 F.Supp. at 457 (quoting *Salerno,* 429 F.2d at 1005).

■ We choose to follow the lead of those courts that conclude the business of professional baseball is exempt from federal anti-trust laws.[19] Further, we conclude that the sale and relocation of a baseball franchise, like the reserve clause discussed in *Flood,* is an integral part of the business of professional baseball and falls within the exemption.[20] In the past, we have deemed it proper to look to decisions made under corollary federal statutes "of a similar character for the principle by which to construe our own statute." *Duluth Bd. of Trade,* 107 Minn. at 517, 121 N.W. at 399. Accordingly, we hold that the conduct of the Twins being investigated by the Attorney General is exempt from Minnesota, as well as federal, antitrust laws. Enforcement of the CIDs against the Twins is therefore outside the scope of the Attorney General's authority because no enforcement action could follow. *See Phoenix Bd. of Realtors, Inc. v. United States Dept. of Justice,* 521 F.Supp. 828, 830 (D.Ariz.1981) (holding that "[a]n activity which is exempt from the antitrust laws, cannot form the basis of an antitrust investigation") (citation omitted). Because as a matter of law the Attorney General is precluded from prosecuting the Twins on these antitrust allegations, the district court erred when it issued an order compelling compliance with the CIDs. The Twins are entitled to a protective order under Minn. R. Civ. P. 26.03.

We reverse the court of appeals and remand this matter to the district court for proceedings consistent with this opinion.

LANCASTER, J., took no part in the consideration or decision of this matter.

---

**19.** Because our holding is dispositive of this action, we need not address the argument that the Commerce Clause prohibits the enforcement of state antitrust laws against appellants.

**20.** *See State v. Milwaukee Braves, Inc.,* 31 Wis.2d 699, 144 N.W.2d 1, 15 (1966) ("The type of decision involved in this case, in essence, whether to admit a new member [of the league] in order to replace an existing member which desired to move to a new area, appears to be so much an incident of league operation as to fall within the exemption.").